**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

KEITH UNDRAY FORD,
*Petitioner-Appellant*,

v.

SUZANNE M. PEERY, Warden,
*Respondent-Appellee.*

No. 18-15498

D.C. No.
2:15-cv-02463-
MCE-GGH

OPINION

Appeal from the United States District Court
for the Eastern District of California
Morrison C. England, Jr., District Judge, Presiding

Argued and Submitted January 22, 2020
San Francisco, California

Filed September 28, 2020

Before: William A. Fletcher and Ryan D. Nelson, Circuit
Judges, and Donald W. Molloy,* District Judge.

Opinion by Judge W. Fletcher;
Dissent by Judge R. Nelson

---

*  The Honorable Donald W. Molloy, United States District Judge for
the District of Montana, sitting by designation.

## SUMMARY[**]

### Habeas Corpus

The panel reversed the district court's denial of Keith Ford's habeas corpus petition challenging his first-degree murder conviction, and remanded with instructions to conditionally grant the writ, in a case in which the prosecutor, at the end of his closing-argument rebuttal, told the jury that the presumption of innocence no longer applied.

Because there was no state-court decision to which the panel could defer in determining whether the prosecutor misstated federal law and, if so, whether that statement violated due process under *Darden v. Wainwright*, 477 U.S. 168 (1986), the panel reviewed Ford's *Darden* claim de novo. The panel held that the prosecutor's repeated statements, endorsed by the trial judge, that the presumption of innocence no longer applied violated due process under *Darden*. The panel explained that a holding of a due process violation under *Darden* necessarily entails a conclusion that the prosecutor's misstatements of the law were prejudicial. The panel further held that the California Court of Appeal unreasonably concluded under *Chapman v. California*, 386 U.S. 18 (1967), that the prosecutor's misstatements of the law were harmless beyond a reasonable doubt.

Dissenting, Judge R. Nelson wrote that the majority ignores the highly deferential standard owed to the California Court of Appeal's harmlessness conclusion under AEDPA

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

and instead adopts a broad exercise of supervisory power over a state court's trial proceedings, inconsistent with the narrow legal standard for habeas review.

## COUNSEL

Barry Morris (argued), Walnut Creek, California, for Petitioner-Appellant.

Kristin Liska (argued), Associate Deputy Solicitor General; Jill M. Thayer, Deputy Attorney General; Peggy S. Ruffra, Supervising Deputy Attorney General; Jeffrey M. Laurence, Senior Assistant Attorney General; Lance E. Winters, Chief Assistant Attorney General; Xavier Becerra, Attorney General; Attorney General's Office, San Francisco, California; for Respondent-Appellee.

## OPINION

W. FLETCHER, Circuit Judge:

In August 2010, Ruben Martinez was shot and killed in Vallejo, California. Keith Ford was charged with first degree murder with three firearm enhancements. Ford was tried in the California Superior Court for Solano County in August 2012.

During closing argument, at the end of his rebuttal, the prosecutor told the jury that the presumption of innocence no longer applied. He said:

> *This idea of this presumption of innocence is over.* Mr. Ford had a fair trial. We were here for three weeks where . . . he gets to cross-examine witnesses; also an opportunity to present evidence information through his lawyer. He had a fair trial. This system is not perfect, but he had a fair opportunity and a fair trial. *He's not presumed innocent anymore.*

(Emphases added.) The defense attorney objected, "That misstates the law." The court overruled the objection. The prosecutor resumed, *"And so we're past that point."*

The jury began deliberating later that day, on Tuesday, August 21, 2012. On Friday, August 24, the fourth day of deliberations, the jury reported that it was "hopelessly deadlocked," with one juror holding out for acquittal. The court sent the jury back to deliberate further. The following Tuesday, August 28, the jury returned a unanimous verdict that defendant Ford was guilty of first-degree murder. The jury was still "hopelessly deadlocked" on three firearm enhancements, including an enhancement for "personal use of a firearm during the commission of the crime." The final vote on the "personal use" enhancement was seven to five. The court declared a mistrial as to all three firearm enhancements.

Martinez had been killed with a single shot to his head. The prosecutor had contended that Ford had shot Martinez. The prosecutor had never contended, or even suggested, that anyone other than Ford had fired the shot that killed Martinez.

After exhausting his state-court remedies, Ford sought federal habeas relief under 28 U.S.C. § 2254. We answer two principal questions. First, in overruling the objection to the prosecutor's statements that the presumption of innocence no longer applied did the California Superior Court violate due process under *Darden v. Wainwright*, 477 U.S. 168 (1986)? Second, was the California Court of Appeal objectively unreasonable in holding that any error was harmless beyond a reasonable doubt under *Chapman v. California*, 386 U.S. 18 (1967)? We answer "yes" to both questions.

## I. The Trial

### A. Summary of Evidence Presented

On August 7, 2010, a Saturday evening, Ruben Martinez was killed in his SUV in front of his girlfriend's house on a short block of Beach Street between Benicia Road and Central Avenue in Vallejo, California. At about 10:00 p.m., Martinez had driven his girlfriend Jessica Blanco home so she could use the bathroom, check movie times, and get her jacket. Just before Martinez turned left onto Beach Street from Benicia Road, a white car ahead of them made a U-turn and went back past them the other way on Benicia Road. Blanco later testified at trial that she had not been able to see anyone in the car and that she could not identify the make or model of the car.

When they arrived at her house, Blanco went inside while Martinez stayed in his SUV with the motor still running. Martinez had washed the SUV earlier in the day. Blanco testified at trial that a few minutes after walking into the house, she heard a loud popping noise and the revving of an engine. She "heard a screeching noise, tires peeling, gravel."

Blanco went outside and saw that Martinez's SUV had crashed into a neighbor's garage down the street.

A few minutes before Martinez was shot, Bethel Johnson ("Johnson") and two of her children arrived at their house across the street from Blanco's house. When Johnson got out of her car, she saw Martinez sitting in his SUV with the motor running and headlights on, and with the driver's side window rolled up. Johnson testified that she could see through the tinted window that Martinez was looking at his lighted cell phone. She testified that there was a party on Beach Street at a black motorcycle club about half a block away on the other side of Benicia Road. There was a party at the club "almost every Saturday that month." Johnson testified that three young black men were walking up Beach Street toward the party. Two of them were "maybe 16, 17, 18 years old," and the other was "much older," "19, 21. Between there." Johnson testified that the older man was "somewhere" between 5'6" and 5'9", that he was wearing a dark hooded sweatshirt, and that he had dreads.

Johnson's daughter, Tenley Johnson ("Tenley"), got out of the back seat on the passenger side with the family Rottweiler on a leash. Johnson testified that the dog charged the man she had described as older. She called to Tenley, "Control your dog." Johnson testified that the man "said something like, 'Hi girly,' and then kind of like turned around away from the dog" and walked in the opposite direction toward Central Avenue, away from the party. She testified that she saw no weapons, and that the man said nothing threatening to Tenley. Between two and three minutes after getting into her house, Johnson heard what sounded like a shot and broken glass. Johnson went outside to check on her

car. She found her own car intact and saw no one on the street.

Tenley testified that she, too, had seen Martinez's cell phone light through the window of the SUV. She testified that when she got out of the car, she saw three young black men walking from Central Avenue toward the party on Benicia Road. She described them to a police officer that night as "teenagers." Tenley said her dog "started barking and . . . pulling me." The dog pulled her toward a man with "short hair." She said, "I couldn't really see the face. It was dark." She testified that the man was "skinny." Tenley is 5'3". She described the man as taller than she was and shorter than a 6'0" police officer who interviewed her. Tenley testified that the man was wearing a blue jacket with one or more white stripes "on the sleeves." She said it was "like a track jacket" and that it did not cover his head. One of the other men had dreads. She did not see any of the men's faces. When later shown six photographs, including a photograph of Ford, Tenley did not identify Ford as one of the three "teenagers" she had seen that night.

Another neighbor, Moises Cervantes, was walking out of his house on Beach Street. His house was between Blanco's house and Central Avenue. Cervantes heard a "pop" and saw Martinez's SUV coming toward him. After the SUV crashed, Cervantes looked up and down the street and saw no one.

Martinez was killed with a single shot. His foot was pressed on the gas pedal, causing the SUV to accelerate down the street until it crashed into the neighbor's garage. The engine continued to run, and the rear wheels to spin, even after the SUV came to a stop. Martinez's cell phone was found on the floorboard of the front passenger seat. The

driver's side window was intact and about "a quarter of the way down." The other windows on the driver's side were closed and intact. A photograph introduced into evidence shows two rear side windows on the passenger side that were shattered. At least one of the windows had been broken by first responders.

Five days later, on August 12, two Vallejo detectives lawfully stopped Keith Ford. Ford was twenty-three years old. He is black, is 5'8" tall, and weighs 165 pounds. At the time of the stop, he had short hair. He was driving a white Oldsmobile sedan. The detectives found Ford's cell phone inside his car and discovered six additional cell phones in the center console.

Ford was read his *Miranda* rights. One of the detectives, Les Bottomley, testified that Ford said that he had "bought [the cell phones] stolen off the street." Later in the same interview, however, Ford told Bottomley he did not know whether they had been stolen. Ford told Bottomley that he was right-handed. Bottomley asked Ford where he had been on the night of August 7. Ford answered that he "was at his mother's home and at that time would have been in bed." Bottomley testified that Ford's mother's house is about three and half miles from Blanco's neighborhood. Bottomley did not ask Ford about Martinez's murder.

When Ford was stopped, he had a jacket in his car. Detective Bottomley testified that he later showed the jacket to Tenley. Tenley told him that it was not the jacket she had seen on the young man with the short hair on August 7.

Ford was arrested on September 26 and charged with having a concealed firearm in his vehicle on that date. It was

stipulated to the jury that the firearm was unrelated to Martinez's murder. Ford was held on the charge in the Solano County Jail until December 14. On December 13, Detective Bottomley interviewed Ford again. He asked Ford if he knew Martinez. Bottomley testified that Ford said "he did not think he did." Ford repeated that he had been at his mother's house on the night of August 7 and had spent the night there. Bottomley told Ford that his palm print had been found on Martinez's SUV. Ford replied, "That don't mean nothing. That just mean I came in contact with the vehicle at one time or another."

While Ford was in jail on the firearm charge, he spoke to his girlfriend on the telephone. The call was recorded. Ford said:

> [L]uckily I ain't in here for murder, that's all I keep thinking about . . . oh well I wish it didn't have to happen . . . I just [wish] I was at home . . . I know I gotta deal with my (unintelligible) it's too late for all that . . . to be wishing I was at home . . . See I'm disappointed in myself. But [expletive] that's what happens when you carry a gun. Ain't nothin good gonna come of it. And I know this and [expletive] still happen, cause I tell other people the only thing you gonna get out of a gun is you gonna throw down with it or you gonna shoot somebody with it. And I tell everybody that and look at my [expletive].

A recording of the call was played for the jury.

Several months after the murder, the following message appeared on Ford's Facebook page, directed at someone who had accused Ford of shooting him:

> I heard through the grapevine you was looking for the guy. Let me know something. And since you think I popped you, check this out. First off, I don't [expletive] with the Vistas. Second off, I am too good of a shooter to hit a [expletive] that many times and not knock they [expletive] down. Last, when you getting shot, I was on Fifth buying some syrup off Jigs. Plus, I don't even [expletive] with [expletive], so ain't nobody talked to me since I got out of jail last. Real killers move in silence. And would I brag on a job I didn't even complete? [Expletive] knocking [expletive] down. I don't need credit for an attempt, so take that how you want to.

The message was read to the jury.

The prosecution presented testimony from four fingerprint analysts about the partial latent palm print found on Martinez's SUV. Niki Zamora of the San Mateo County Forensics Laboratory testified that she examined the SUV on August 11. She discovered a latent partial left palm print on the outside of the driver's door, just below the window. The exterior of the vehicle was "rather dirty," with dirt and a sticky white substance on the door where she found the print. Fire extinguishers had been used on the SUV after the crash. Zamora testified that she cleaned off only some of the "dirt and debris" before "dusting" and taking her "first lift" of the print. She did not indicate on the "fingerprint card" that the

area from which the print was lifted "had debris on it." Zamora was not "certified as a crime scene processor" because she "hadn't had enough experience yet."

Frankie Franck, a certified latent print examiner, matched Zamora's "first lift" to Ford's palm print. Franck compared the latent print to "several" electronically taken prints ("Live Scan prints") that he had been given, including one from Ford taken in October 2009 in Butte County, California. Franck testified that the latent print obtained by Zamora "was not of the best quality," and that it covered "probably 30 percent" of the total palm. Despite the quality of the latent print, and despite the fact that it was only a partial print, Franck testified that he was certain of the match—"[a]s certain as I am sitting here."

Zamora then confirmed Franck's match. She conceded that she had not followed the lab's normal protocol, which required that a confirming print analyst "not, in any way, [be] associated with the work that . . . had [been] done." Zamora was, of course, directly associated with that work, for she had lifted the latent print from the SUV. Zamora was not certified as a latent print examiner. She had taken the certification test and was awaiting the result.

Darrell Klasey, a certified latent print examiner at the Solano County Sheriff's Office, took a rolled ink print of Ford's hands in May 2011. Klasey compared the ink print of Ford's left palm to the Live Scan print that Franck had been given. Klasey concluded that the ink print and the Live Scan print were from the same person. Cross-examination revealed Klasey's questionable performance at a previous agency.

Lynne Lazzari, a latent fingerprint analyst at the Solano County Sheriff's Office, confirmed Klasey's conclusion. Her analysis was based only on the two prints that Klasey had given her (Ford's ink print and the Live Scan print analyzed by Franck), and she knew that Klasey had already concluded that they matched. Lazzari testified, "I did my own independent study and came up with why it was the same person." She testified that she "more or less" followed a standard method for comparing prints. When questioned about the standard method, which requires examining the unknown print before the known print, she responded that she compared the prints side by side: "Well, that's why I said 'more or less.' I do it my way." When asked whether her method had "ever been tested or validated for accuracy," she responded, "No." Lazzari had never taken the test to be certified as a latent print examiner.

There was also testimony about the condition of Martinez's SUV after it crashed into the garage. As noted above, Zamora had examined the SUV on August 11, 2010. She testified that the driver's side window was intact and was "partially down." Detective Bottomley, who had been at the crime scene on the night of the murder, had earlier testified that the driver's side window was intact and was "about a quarter of the way down." According to the prosecution's crime scene reconstructionist, the driver's side window was 1.2 feet open, and a 5'8" individual could stand by the SUV and reach through the window without contortion. The prosecutor asked whether there was a "[l]arge enough space to put a hand in." Bottomley had answered, "Absolutely." Zamora testified that the other driver's side windows were intact but that the "two rear passenger side windows" were "shattered," with "[n]o glass there." Photographs of the SUV, supporting Zamora's testimony, were shown to the jury.

Zamora testified that there were no bullet holes "either inside . . . or outside" the SUV.

Finally, Susan Hogan, M.D., a forensic pathologist, testified about the bullet wound and the manner of shooting. She testified that Martinez was killed by a single shot to the back left side of his head. The bullet entered about an inch and a half from the top of his head and two inches left from the posterior (back) midline. It traveled downward, forward, and to the right, coming to rest in the soft tissue of the right side of the neck. Dr. Hogan testified that death was "[v]irtually instantaneous." She testified that there was no soot or "stippling" at or near the entry point, which meant that the shot was fired from "at least three feet away."

Defense counsel presented evidence that other than a brief conversation on the night of the murder, law enforcement did not identify or contact anyone at the motorcycle party down the street. Law enforcement collected license plate numbers of all of the vehicles on the street, but did not follow up on any of them. Law enforcement never showed Blanco a picture of Ford's white Oldsmobile to determine whether it was the car she had seen on the night of the murder. No one reviewed the contents of the stolen cell phones recovered from Ford's car. Though one witness reported hearing multiple shots, the only bullet found was the one that killed Martinez. No gun or shell casings were ever found. There was gunshot residue on the inside of the driver's side door, but there was no residue on the window seal of the door or on Martinez's clothes. The only DNA found at the scene belonged to Martinez.

## B. Attorneys' Arguments

In his closing argument, the prosecutor contended that Martinez's murder was "a robbery gone bad." His theory was that Ford had put his left hand on the outside of the driver's side door, had reached through the partially opened driver's window with his right hand, and had shot Martinez in the head:

> There is compelling evidence in this case, . . . and that would be the defendant's palm print on the victim's car on his driver's door, right in the position where a person, a right-handed person with a firearm in their right hand, would have shot and killed the victim. . . . No unusual contortion would have to take place for a person of 5'8" to stick their hand in there and fire.

The prosecutor further argued that Ford's recorded telephone conversation with his girlfriend and his Facebook post supported his contention that Ford shot Martinez.

The prosecutor did not try to reconcile his contention that Ford had reached through the driver's side window and shot Martinez as he sat in the driver's seat with Dr. Hogan's testimony, which required the gun to have been "at least" three feet away. The prosecutor also did not try to reconcile his contention with Johnson's testimony that she had heard the sound of a shot and broken glass and with the photograph of the SUV showing that two rear side passenger windows had been shattered.

In her responsive closing argument, Ford's attorney contended that the fingerprint identification was unreliable. She emphasized the poor quality of the latent palm print lifted from the SUV by Zamora and contended that the unqualified fingerprint analysts were not to be trusted. She contended that in his telephone conversation with his girlfriend, Ford was "talking about the fact that he's in custody for a gun and thank God, thank God he didn't kill anyone." She characterized Ford's Facebook post as "talking smack to someone behind a computer screen."

At the end of his rebuttal closing argument, the prosecutor told the jury:

> *This idea of this presumption of innocence is over.* Mr. Ford had a fair trial. We were here for three weeks where . . . he gets to cross-examine witnesses; also an opportunity to present information through his lawyer. He had a fair trial. This system is not perfect, but he had a fair opportunity and a fair trial. *He's not presumed innocent anymore.*

(Emphases added.) Ford's attorney objected, "That misstates the law." The court held a sidebar. The court then said in front of the jury, "All right. The objection is overruled." The prosecutor resumed, "*And so we're past that point.*" The jury began its deliberations shortly thereafter, on the same day.

## C.  Jury Deliberations

On the second day of deliberations, the jury sent out a written question: "If someone believes that the defendant was present at the time of the shooting and was an active

participant in the attempted robbery, but was not the actual shooter, does that imply guilt of either the first or second-degree murder charge?" The court commented to the attorneys, "It's certainly an unusual question, given there was really no one [who] argued that there was someone else while the defendant was present." The prosecutor suggested the question might have reflected the fact that two other people had been described in the testimony, "although I didn't even make any arguments about them at all in my closing or that they had any involvement." With the agreement of both counsel, the court simply referred the jury to the instructions already given. The jury also requested a readback of Johnson's testimony.

On the fourth day of deliberations, Friday, August 24, the jury reported that they were "hopelessly deadlocked," with one juror holding out for acquittal. After taking testimony from jury members individually, the court sent them back to deliberate further.

The following Tuesday, August 28, the jury returned a unanimous verdict that Ford was guilty of first-degree murder. The jury reported that they were "hopelessly deadlocked" on the three firearm enhancements. The court inquired as to the firearm enhancements. It learned that the final vote on the first enhancement—"personal use of a firearm during the commission of the crime"—had been seven to five. It did not learn whether the guilty or not-guilty votes predominated. The court declared a mistrial as to all three firearm enhancements.

## II.  Post-Trial Procedural History

Ford appealed his conviction to a California Court of Appeal.   The court wrote, "According to Ford, the prosecutor's comments about the presumption of innocence misstated the law and deprived him of a fair trial."

The Court of Appeal identified a conflict among the California Courts of Appeal with respect to the presumption of innocence.  Several Courts of Appeal had held that there was no prosecutorial misconduct when the prosecutor told the jury that the presumption of innocence no longer applied once sufficient evidence of guilt had been presented.  For example, in *People v. Goldberg*, 161 Cal. App. 3d 170, 189 (1984), the court affirmed the conviction and found no prosecutorial misconduct in a case in which the prosecutor had said in closing argument, "[O]nce you've heard this case, once the case has been proven to you—*and that's the stage we're at now*—the case has been proved to you beyond any reasonable doubt.  I mean, it's overwhelming.  *There is no more presumption of innocence.*"  (First emphasis added.)  But a different Court of Appeal later reached a contrary conclusion.  In *People v. Dowdell*, 227 Cal. App. 4th 1388, 1407 (2014), the prosecutor twice told the jury during closing argument, in light of the strength of the State's evidence, that "[t]he presumption of innocence is over."  The court in *Dowdell* distinguished *Goldberg* and ruled that defense counsel should have objected because the prosecutor misstated the law, but it held, on the record before it, that the error was harmless.

In the case before us, the Court of Appeal declined to reach the question whether the prosecutor had misstated the law. Assuming without deciding that the prosecutor had done so, the court held that any error was harmless: "We need not

resolve any conflict between *Goldberg* [and other cases] on the one hand, and *Dowdell* on the other because we conclude any assumed error is harmless under either the state ([*People v.*] *Watson*, [(1956)] 46 Cal.2d 818[, 836]) or federal constitutional standard (*see Chapman v. California* (1967) 386 U.S. 18, 24)."

The California Supreme Court denied Ford's petition for review in a one-line order. Ford then sought state habeas in California Superior Court, claiming, inter alia, that the prosecutor had committed misconduct by telling the jury that "the presumption of innocence is over." The Superior Court did not reach the merits of the claim because it had been raised and rejected on direct appeal.

Ford then sought federal habeas relief under 28 U.S.C. § 2254. He made several claims: (1) the prosecutor's statements during closing argument that the "presumption of innocence is over" and "petitioner is not presumed innocent anymore" violated due process and were not harmless; (2) the trial court's response to a question asked by the jury violated due process; (3) defense counsel provided ineffective assistance in failing to object to the trial court's response to the jury's question; (4) it cannot be determined whether the jury convicted Ford on a legally incorrect theory; (5) improper admission of the Facebook post; and (6) cumulative error. A magistrate judge recommended denying Ford's petition and granting a Certificate of Appealability on Claims (2), (3), and (4). The district judge adopted the magistrate judge's Report and Recommendation in full.

Ford appealed the denial of Claims (1) and (4). We asked the State to brief Claim (1) and now grant a Certificate of

Appealability as to that claim.  We reverse the district court on Claim (1).  We do not reach Claim (4).

## III.  Standard of Review

In order to obtain habeas relief in federal court, petitioners must show that the state court proceedings "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or . . . resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 402 (2000).  We defer to the last reasoned decision of the state court.  *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991); *Mann v. Ryan*, 828 F.3d 1143, 1151 (9th Cir. 2016).  Here, that is the decision of the California Court of Appeal on direct appeal.

## IV.  Discussion

### A.  Due Process Violation under *Darden*

The question before us is whether the prosecutor's statements during closing argument that the presumption of innocence was now "over" amounted to prosecutorial misconduct in violation of due process under *Darden v. Wainwright*, 477 U.S. 168 (1986).  The California Court of Appeal declined to reach the substantive question of whether the prosecutor misstated the law.  It did not mention *Darden*. It held only that any presumed error was harmless beyond a reasonable doubt under *Chapman*.  There is no state-court decision to which we can defer in determining whether the prosecutor misstated federal law and, if so, whether that

misstatement violated due process under *Darden*. We therefore review the *Darden* claim de novo.

For the reasons that follow, we hold that the prosecutor's statements violated due process under *Darden*. Prosecutorial misconduct under *Darden* includes misstatements of law. *See Deck v. Jenkins*, 814 F.3d 954, 985 (9th Cir. 2016) (finding *Darden* error where "the prosecutor gave incorrect direction to the jury about an element of California law under which Deck was convicted"). Improper prosecutorial statements violate due process if they "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181 (citation omitted). Prosecutorial misconduct within the meaning of *Darden* does not require improper motive on the part of the prosecutor; it requires only an improper statement. But such misconduct "rises to the level of *Darden* error only if there is a reasonable probability that it rendered the trial fundamentally unfair." *Deck*, 814 F.3d at 985.

In stating that the presumption of innocence was now "over," the prosecutor misstated federal law. The presumption of innocence is "the undoubted law, axiomatic and elementary"; the presumption of innocence is "vital and fundamental." *Coffin v. United States*, 156 U.S. 432, 453, 460 (1895). The presumption is "a basic component of a fair trial under our system of criminal justice." *Estelle v. Williams*, 425 U.S. 501, 503 (1976). Its "enforcement lies at the foundation of the administration of our criminal law." *Coffin*, 156 U.S. at 453; *see also Reed v. Ross*, 468 U.S. 1, 4 (1984).

The Supreme Court has repeatedly made clear that criminal defendants lose the presumption of innocence only

after they have been convicted.  *See*, *e.g.*, *Herrera v. Collins*, 506 U.S. 390, 399 (1993) ("Once a defendant has been afforded a fair trial *and convicted* of the offense for which he was charged, the presumption of innocence disappears.") (emphasis added); *Delo v. Lashley*, 507 U.S. 272, 278 (1993) ("Once the defendant has been *convicted* fairly in the guilt phase of [a capital] trial, the presumption of innocence disappears.") (emphasis added); *Betterman v. Montana*, 136 S. Ct. 1609, 1618 (2016) (a conviction "terminates the presumption of innocence").

Under *Darden*, we ask whether "there is a reasonable probability" that the prosecutor's misstatement of law "rendered the trial fundamentally unfair" and thus violated due process.  *Deck*, 814 F.3d at 985.  In *Hein v. Sullivan*, 601 F.3d 897 (9th Cir. 2010), we listed the multiple factors considered by the Supreme Court in *Darden* in determining whether improper prosecutorial statements rise to the level of a due process violation.  We wrote:

> The *Darden* factors—i.e., the weight of the evidence, the prominence of the comment in the context of the entire trial, whether the prosecution misstated the evidence, whether the judge instructed the jury to disregard the comment, whether the comment was invited by defense counsel in its summation and whether defense counsel had an adequate opportunity to rebut the comment—require courts to place improper argument in the context of the entire trial to evaluate whether its damaging effect was mitigated or aggravated.

*Id.* at 914. "In essence, what *Darden* requires reviewing courts to consider appears to be equivalent to evaluating whether there was a 'reasonable probability' of a different result." *Id.* at 914–15; *see also Deck*, 814 F.3d at 979. The reasonable probability test is not whether Ford "would more likely than not have received a different verdict" absent the prosecutor's misconduct. *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). Rather, the test is whether Ford received "a trial resulting in a verdict worthy of confidence." *Id.*

We hold that the prosecutor's repeated statement during closing argument that the presumption of innocence no longer applied constituted *Darden* error. We take in turn the "*Darden* factors" listed in *Hein*.

"The weight of the evidence" against Ford, *Hein*, 601 F.3d at 914, was not great. As recounted above, the evidence was circumstantial, incomplete, and in conflict. While there was some inculpatory evidence (the partial palm print, the stolen cell phones, Ford's conversation with his girlfriend, and Ford's Facebook post), no one saw the shooting. Neither of the two witnesses who had seen three young black men on the street shortly before the shooting could identify Ford. The manner of shooting hypothesized by the prosecutor conflicted with his expert's testimony the gun had been at least three feet away from Martinez when it was fired. The hypothesized manner of shooting was also inconsistent with Johnson's testimony that she heard the sound of a shot and broken glass, and with the fact that passenger side, rather than driver side, windows were shattered.

The jury clearly had trouble with the evidence. After four days of deliberations, they reported to the court that they were

"hopelessly deadlocked." The court sent them back to deliberate further. When the jury returned, their answer was internally inconsistent. It was uncontested that Martinez had been killed with a single shot to the head. Ford had been charged with shooting and killing Martinez. The jury found Ford guilty of the murder charge. But the jury was split with a vote of seven to five on whether Ford had used a firearm in killing Martinez.

The "prominence" of the prosecutor's statements, *id.*, could hardly have been greater. During the course of his closing argument, the prosecutor had repeatedly said that the state had the burden of proof to show guilt beyond a reasonable doubt. But then, at the end of his rebuttal in his closing argument, the prosecutor stated three times that the presumption of innocence no longer applied. The prosecutor's rebuttal was the last thing the jury heard from either of the attorneys. The jury retired to begin deliberations later that same day.

Although the prosecutor did not "misstate[] the evidence," *id.*, he misstated the law. He did so three times, in the space of a few moments.

The judge did not "instruct[] the jury to disregard the comment." *Id.* Quite the opposite. When Ford's attorney objected to the prosecutor's misstatements, the judge held a sidebar and then overruled the objection. A written instruction told the jury about the existence of the presumption of innocence: "A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt." However, the written instruction did not tell the jury when the presumption applied and when it was "over." The

judge supplied that instruction. When he overruled the defense's objection to the prosecutor's misstatements, the judge told the jury, in effect, that the presumption of innocence was "over" before they retired to begin deliberations.

Ford's attorney neither "invited" the prosecutor's misstatements, nor was she given "an adequate opportunity to rebut" them. *Id.* The prosecutor did not state in his initial closing argument that the presumption of innocence was "over." Had he done so, Ford's attorney could have emphatically—and correctly—stated in her responsive closing argument that the presumption of innocence lasts unless and until a defendant is convicted. Instead, the prosecutor made his misstatements in rebuttal. At that point, Ford's attorney could only make an objection, which the judge improperly overruled.

We conclude that there was a reasonable probability of a different outcome in this thin, circumstantial case had the prosecutor not misstated the law. Therefore, we hold under *Darden* that the prosecutor's error violated due process.

## B. No Need for a Separate Prejudice Determination

Federal habeas relief is available only if there was "actual prejudice" resulting from an error. *Davis v. Ayala*, 576 U.S. 257, 267 (2015) (citation omitted); *Deck*, 814 F.3d at 985. On collateral review, we determine prejudice by applying the harmlessness standard articulated in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), whether a constitutional violation had a "substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 623 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

In *Darden* cases, prejudice is incorporated into the analysis of the due process violation itself. There is a due process violation under *Darden* when there was a "reasonable probability of a different result" absent the prosecutor's misconduct. *Hein*, 601 F.3d at 914–15 (internal quotation marks omitted). The Supreme Court explained in *Kyles* that a determination that there is a "reasonable probability" of the different outcome "necessarily entails the conclusion that the suppression must have had a 'substantial and injurious effect or influence in determining the jury's verdict.'" *Kyles*, 514 U.S. at 435 (quoting *Brecht*, 507 U.S. at 623). Once there has been a determination that absent the error there was a "reasonable probability" of a different outcome, the error "cannot subsequently be found harmless under *Brecht*." *Id.* at 436.

## C. AEDPA Deference

On direct appeal, the California Court of Appeal declined to decide whether the prosecutor had misstated the law. Assuming without deciding that he had done so, the Court of Appeal held under *Chapman* that any error was "harmless beyond a reasonable doubt." *Chapman*, 386 U.S. at 24. The Court of Appeal did not mention *Darden* and made no holding with respect to whether there was a "reasonable probability" that the prosecutor's misstatements affected the outcome of the proceeding.

A determination of prejudice constitutes an "adjudication on the merits" for purposes of triggering AEDPA deference. *See Davis*, 576 U.S. at 269 (holding that the state court's determination of harmlessness "undoubtedly constitutes an adjudication of [petitioner's] constitutional claim 'on the merits'"). We recognize, of course, that the *Chapman* test is

more favorable to Ford than *Darden*'s "reasonable probability" test. A determination that an error was harmless under *Chapman* would therefore necessarily entail a determination that the error did not have a "reasonable probability" of changing the result under *Darden*. But under AEDPA, if a state court articulates its reasoning, it is only that reasoning that receives deference. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018) (instructing courts to "look through" a summary affirmance for the relevant rationale provided by the lower court); *Ylst*, 501 U.S. at 803; *cf. Harrington v. Richter*, 562 U.S. 86, 98 (2011). The Court of Appeal's reasoning was based on *Chapman*. We therefore ask whether the state court was unreasonable in holding that the prosecutor's misstatement of the law was "harmless beyond a reasonable doubt" under *Chapman*. We conclude that it was.

As we outlined in detail above, this was a very close case. The evidence against Ford was circumstantial, incomplete, and in conflict. The jury was unable, despite extensive deliberations, to reach an internally consistent decision on Ford's guilt. The jury deliberated for four days and reported to the court that it was "hopelessly deadlocked." After further deliberation, the jury returned a verdict that Ford was guilty of murdering Martinez by shooting him in the head, but hung on the question of whether Ford had used a firearm. In these circumstances, we conclude that it was "objectively unreasonable" for the Court of Appeal to conclude under *Chapman* that the prosecutor's misstatements of the law were harmless beyond a reasonable doubt.

Conclusion

We hold that the prosecutor's repeated statements, endorsed by the trial judge, that the presumption of innocence no longer applied violated due process under *Darden*. A holding of a due process violation under *Darden* necessarily entails a conclusion that the prosecutor's misstatements of the law were prejudicial. We further hold that the Court of Appeal unreasonably concluded under *Chapman* that the prosecutor's misstatements of the law were harmless beyond a reasonable doubt. We reverse the decision of the district court and remand with instructions to conditionally grant the writ, subject to the State's retrying Ford within a reasonable time not to exceed 180 days.

**REVERSED and REMANDED.**

R. NELSON, Circuit Judge, dissenting:

The majority vacates Keith Ford's first degree felony murder conviction on habeas review only by ignoring the highly deferential standard we owe to the California Court of Appeal's harmlessness conclusion under the Antiterrorism and Effective Death Penalty Act ("AEDPA"). Instead, the majority adopts a "broad exercise of supervisory power" over a state court's trial proceedings, inconsistent with the narrow legal standard for habeas review. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). Applying the correct legal standard, I would affirm the district court's denial of the habeas petition.

Misstatements of the law by a prosecutor only amount to a due process violation under *Darden* if they render the trial fundamentally unfair. In their proper context, the prosecutor's closing argument statements regarding the presumption of innocence merely emphasized the government had carried its burden of proving Ford's guilt beyond a reasonable doubt. There is no reasonable probability that the jury was confused about this presumption, given the prosecutor's repeated reaffirmation of the presumption and the trial court's repeated, explicit instructions to the jury regarding both the government's burden of proof *and* the presumption of innocence. These instructions were more than sufficient to remedy any potential unfairness that may have resulted from the isolated comments. And even if there was *Darden* error, the majority misapplies AEDPA deference in finding that the California Court of Appeal's harmlessness conclusion was objectively unreasonable. Therefore, I respectfully dissent.[1]

# I

A brief review of the relevant background is warranted. Ruben Martinez was shot at point blank range in his car, while he waited to take his girlfriend on a date, after quickly

---

[1] The majority grants a Certificate of Appealability as to Ford's claim that the prosecutor's statements regarding the presumption of innocence violated due process. Majority at 18–19. I would deny the Certificate of Appealability because Ford has not made a "substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2). *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000) ("Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.").

dropping her off at her house. After a three-week trial, petitioner Keith Ford was convicted of first degree felony murder.

During trial, the jury heard that Martinez had washed his car just hours before he picked his girlfriend up for the date and his car was "clean and shiny." *People v. Ford*, No. A137496, 2014 WL 4446166, at *1 (Cal. Ct. App. Sept. 10, 2014). A fingerprint examiner testified that after the murder, "a latent palm print on the driver's side of the door of Martinez's SUV, just beneath the window[,] . . . matched Ford's left palm print." *Id.* at *2. The examiner "was certain 'both impressions were made by the same palm.'" *Id.* Ford never explained how his left palm print was on Martinez's car, in the exact location consistent with a right-handed man leaning into the driver window, particularly where the car had just been washed.

The jury also heard that a white car was seen driving in the same direction as Martinez and "made an abrupt U-turn directly in front of Martinez's car" moments before Martinez stopped at his girlfriend's house and just before Martinez was murdered. *Id.* at *1. Ford drove a white car.

The jury also heard that three young African American men were walking toward Martinez as he waited in his car for his girlfriend. One had short hair cut close to his scalp. Ford is African American and at the time was 23 years old, had short hair and was the approximate height described.

The jury also heard that as Martinez waited for his girlfriend, he was on his cell phone, which was visible through his car window. A few days after the murder, Ford was stopped by a detective and six stolen cell phones were

found in the center console of Ford's car. Ford indicated to the detective that on the night Martinez was murdered, Ford was at his mother's house in Vallejo, about three miles from where Martinez was shot.

The jury also heard that four months after Martinez was murdered, Ford was in jail for an unrelated firearm possession charge. Ford called his girlfriend from jail and said, "'luckily I aint in here for murder'" and noted that he knew he should not carry guns because "'the only thing you gonna get out of a gun is you gonna throw down with it or you gonna shoot somebody with it.'" *Id.* Several months after Martinez's murder, Ford posted on Facebook comments about being suspected of a murder and described in detail how he would conduct a murder.

Before closing argument, the state trial court orally instructed the jury regarding the presumption of innocence and the government's burden to prove its case beyond a reasonable doubt. The jury was instructed to form no opinion about the case until after jury deliberations began. And the jury was instructed to follow the law as detailed in the written jury instructions and to disregard any of counsel's comments that may conflict with the jury instructions.

In closing, the prosecutor repeatedly reminded the jury that the government bore the burden to prove its case beyond a reasonable doubt. The prosecutor then walked through the evidence detailed above. In rebuttal, the prosecutor stated, "This idea of this presumption of innocence is over. . . . He's not presumed innocent anymore." This drew an objection from defense counsel, overruled by the trial court because the jurors have "been reminded continuously that they're not to form or express any opinions until after they deliberate with

their fellow jurors, so I don't think there's any particular harm in that . . . ." The prosecutor then stated, "And so we're past that point."

After closing, the district court provided the jury written instructions, including regarding the presumption of innocence, which were taken back into the jury room for deliberations. Defense counsel made no request for any additional jury instruction on the presumption of innocence.

The jury heard evidence more than sufficient to support, beyond a reasonable doubt, Ford's first degree felony murder conviction. The California Court of Appeal affirmed Ford's conviction on direct appeal, finding that any alleged prosecutorial misconduct was harmless. The California Supreme Court denied review. The federal magistrate judge recommended denial of Ford's habeas petition and the district court adopted the magistrate's recommendation in full. While the district court certified three questions for appeal, the district court did not certify the question regarding potential prosecutorial misconduct which the majority relies on to reverse and vacate Ford's first degree felony murder conviction.

## II

The majority holds that the prosecutor's comments "during closing argument that the presumption of innocence no longer applied constituted *Darden* error." Majority at 22. In my view, however, the prosecutor's isolated comments, taken in full context of the closing statements and jury instructions, were not misconduct that "so infected the trial with unfairness as to make [Ford's] conviction a denial of due process" under *Darden*, 477 U.S. at 181 (internal quotation

marks and citation omitted). By cherry-picking and examining the prosecutor's comments in isolation, the majority disregards the Supreme Court's admonition that "the arguments of counsel . . . must be judged in the context in which they are made." *Boyde v. California*, 494 U.S. 370, 385 (1990). The majority misconstrues the prosecutor's comments rather than interpreting them in context of his full closing and rebuttal arguments. In context, the comments do not rise to the level of prosecutorial misconduct. But even assuming a risk of juror confusion from the prosecutor's comments, no reasonable probability exists that Ford was deprived of a fair trial in light of the trial court's oral instruction to the jury before the prosecutor's closing, and its written instruction—after the prosecutor's closing and taken into the jury deliberation room—regarding the presumption of innocence.

First, "a court should not lightly infer that a prosecutor intend[ed] an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." *Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974). The majority reaches its conclusion only by skewing the evidence and inferences in the light most favorable to Ford. It thus infers that the jury drew the most damaging interpretation of the challenged comments, rather than the more likely, less damaging interpretation. In context, the prosecutor argued in closing that the government had met its burden of proving its case beyond a reasonable doubt, thereby overcoming the presumption of innocence. His challenged comments were not (as the majority concludes) inviting the jurors to disregard the presumption of innocence when they retired to the deliberation room.

The prosecutor made numerous statements supporting the more reasonable interpretation (largely ignored by the majority). For instance, the prosecutor introduced his closing argument, noting, "I'm going to go back over the facts of this case and show you why I have proven beyond a reasonable doubt that the defendant committed murder in this case . . . ." He hewed closely to this theme, repeating, "I want to tell you why it is that I have proven to you beyond a reasonable doubt that the defendant in this case committed an act that caused the death of Ruben Martinez . . . ." The prosecutor returned to this refrain repeatedly throughout his closing argument, stating the following:

- "Let me tell you . . . why it is that I have proven to you beyond a reasonable doubt that the defendant is guilty";

- "My burden of proof in the case to prove the charge that Mr. Ford is charged with is proof beyond a reasonable doubt";

- "In combination with the other information, that's proof beyond a reasonable doubt . . . . I have never shied away from what my standard of proof is in this case, but it's not an impossible standard. It's proof beyond a reasonable doubt";

- "[W]hen you . . . follow all the evidence and you follow all the law, you're going to reach the same conclusion that I asked you to reach at the beginning of this case that the defendant is guilty of murder";

- "[Y]ou did all make that promise at the beginning and I will hold you to that promise, if I prove my case

beyond a reasonable doubt, that you would not
hesitate for a second to convict the defendant."

On rebuttal, the prosecutor reiterated that defense counsel
"doesn't have to present any evidence. *It is my burden of
proof.*" (emphasis added). He even called the jurors'
attention to the written instructions they would take with
them into the deliberation room, inviting them to "just read
the [reasonable doubt] instruction itself and . . . look at the
instruction and what it says in particular."

Finally, just before making the challenged statements, the
prosecutor walked through the evidence and reiterated, "I've
provided you with all the information that you need to feel
the abiding conviction in the truth of these charges." Each of
his points (including the challenged statements) combine to
form an unremarkable overarching argument: the evidence of
defendant's guilt was so strong that the prosecutor had
successfully proved his case beyond a reasonable doubt and
thus overcome the presumption of innocence.[2] The majority
fails to show any reasonable likelihood that these statements,
taken together, misled the jurors or caused them to believe the
presumption of innocence terminated before they had reached
a verdict of guilty beyond a reasonable doubt.

Contrast this with the facts in *Kentucky v. Whorton*,
441 U.S. 786 (1979), where the Supreme Court held the Due

---

[2] By repeatedly emphasizing the government's burden of proving
guilt "beyond a reasonable doubt," the prosecutor simultaneously
emphasized it was his burden to overcome the presumption of innocence
to which Ford was entitled. This is because the government's burden to
prove a defendant's guilt beyond a reasonable doubt is closely linked with
the presumption of innocence. *See Cool v. United States*, 409 U.S. 100,
104 (1972); *Schultz v. Tilton*, 659 F.3d 941, 943 (9th Cir. 2011).

Process Clause does not require a jury instruction on the presumption of innocence at all. *Id.* at 789–90. In *Whorton*, the jury was instructed that they "could return a verdict of guilty only if they found beyond a reasonable doubt" that the defendant was guilty of the acts charged. *Id.* at 787. This instruction alone—even without the presumption of innocence instruction—was deemed constitutionally sufficient. *See id.* at 789–90. Here, the trial court exceeded the standard in *Whorton*. Not only did the prosecutor repeatedly emphasize that his burden was to demonstrate Ford's guilt beyond a reasonable doubt, *see supra* at 33–34, the jury was also formally instructed by the trial court that Ford was entitled to a presumption of innocence and that this presumption requires proof of guilt beyond a reasonable doubt. Thus, as in *Whorton*, weighing the prosecutor's challenged statements against "all the instructions [provided] to the jury" and "the arguments of counsel," Ford was not "deprived . . . of due process of law in light of the totality of the circumstances." 441 U.S. at 789–90.[3]

The surrounding context of the prosecutor's statements also explains the trial court's decision to overrule defense counsel's objection to the contested statements. The court undoubtedly knew the presumption of innocence continued until jury deliberations, and also understood what the prosecutor meant and reasonably determined the comments in context presented no risk of juror confusion. The court stated (outside the presence of the jury), in response to

---

[3] Although not controlling, the California Supreme Court has twice rejected the specific argument that a prosecutor's misstatement of the presumption of innocence in closing was constitutional *Darden* error. *See People v. Booker*, 245 P.3d 366, 401–02 (Cal. 2011); *People v. Panah*, 107 P.3d 790, 834–35 (Cal. 2005).

counsel's objection: "[The jurors have] been reminded continuously that they're not to form or express any opinions until after they deliberate with their fellow jurors, so I don't think there's any particular harm in that . . . ." The court was also aware the jurors had been explicitly instructed orally on the presumption of innocence and the written instructions would be taken with them into jury deliberations. In short, no reasonable juror would interpret the prosecutor's statements, when considered in context, consistent with the majority's isolated gloss. Despite indications the jurors were confused on other issues, there is no suggestion any single juror was confused on the presumption of innocence. Indeed, the jury acquitted Ford on separate firearm enhancement allegations, which undermines the majority's conclusion that the jurors believed the presumption of innocence was over during the prosecutor's closing.

Second, even assuming that the prosecutor's statements viewed in context rose to the level of a misstatement of federal law, they did not "so infect[] the trial with unfairness as to make the resultant conviction a denial of due process." *Darden*, 477 U.S. at 181 (internal quotation marks and citation omitted). "[E]ven if the [prosecutor's] comment[s are] understood as directing the jury's attention to inappropriate considerations," that does not by itself establish a due process violation under *Darden* absent something more to show that the comments prejudiced the defendant. *See Parker v. Matthews*, 567 U.S. 37, 47 (2012) (per curiam). Courts must consider "whether the jury was instructed to decide solely on the basis of the evidence rather than counsel's arguments, and whether the state's case was strong." *Furman v. Wood*, 190 F.3d 1002, 1006 (9th Cir. 1999); *see also Allen v. Woodford*, 395 F.3d 979, 998 (9th Cir. 2005). Here, the state trial court did not violate due

process under *Darden* because the court's instructions eliminated any "reasonable probability that [the prosecutor's statements] rendered the trial fundamentally unfair." *See Deck v. Jenkins*, 814 F.3d 954, 985 (9th Cir. 2016).

Before closing arguments, the trial court properly orally instructed the jury that the defendant was presumed innocent *and* that the prosecution had to prove each element of the charged offenses beyond a reasonable doubt. The court instructed, "You may not convict the defendant unless the People have proved his guilt beyond a reasonable doubt." The court also informed jurors that they must apply the law as explained by the court's instructions, and that they must disregard any comments or arguments by counsel that conflicted with the court's instructions. Further, the court admonished the jurors that "[n]othing that the attorneys say is evidence. In their . . . closing arguments, the attorneys discuss the case, but their remarks are not evidence." The written jury instructions were subsequently taken into the deliberation room. In light of the written instructions on the presumption of innocence being taken into the jury room, the majority's conclusion that the instructions did not indicate when the presumption ceases falls flat. No court has ever required a temporal statement regarding the presumption of innocence, as suggested by the majority. *See* Majority at 23. And the trial court proceedings clarify why none was necessary.

The majority contends that when the trial court "overruled the defense's objection to the prosecutor's misstatements, the [court] told the jury, in effect, that the presumption of innocence was 'over' before they retired to begin deliberations." Majority at 24. But there is no reasonable support for the majority's interpretation. And certainly none

that would compel this interpretation or preclude far more reasonable and less damaging interpretations. As noted, *supra* at 30–31, 35–36, the district court reasonably explained that it overruled the objection because the prosecutor's statements had caused no harm as the jurors had been repeatedly reminded not to form any opinion until after they deliberated. Moreover, if the majority's interpretation were correct, then the trial court would not have sent the written instruction regarding the presumption of innocence into the jury room.

Ultimately, by dismissing these instructions—both oral and written, and temporally bookending the challenged comments—as inadequate, the majority disregards that we "presume jurors follow the court's instructions absent extraordinary situations." *See Tak Sun Tan v. Runnels*, 413 F.3d 1101, 1115 (9th Cir. 2005); *see also Allen*, 395 F.3d at 998 (although prosecutor's statement was misconduct, "given the trial court's instruction that statements by counsel were not evidence, and given the weight of the evidence against him, the prosecutor's comments did not deprive Allen of a fair trial"); *United States v. Necoechea*, 986 F.2d 1273, 1280 (9th Cir. 1993) (holding the prosecutor's improper remarks in closing argument did not constitute a miscarriage of justice where the court gave a general instruction that attorneys' arguments were not evidence in the case). "[P]rosecutorial misrepresentations . . . are not to be judged as having the same force as an instruction from the court." *Boyde*, 494 U.S. at 384–85. By disregarding the presumption that jurors follow the court's instructions, and giving the prosecutor's isolated statements significantly more force than those instructions, the majority errs.

For these reasons, there is no reasonable likelihood the jury misunderstood the prosecutor's comments and convicted Ford without finding guilt beyond a reasonable doubt. The state trial court did not violate due process under *Darden*.

### III

In concluding that the California Court of Appeal's finding of harmlessness was "objectively unreasonable," the majority misapplies AEDPA deference. Under AEDPA, we cannot order habeas relief unless the state court proceedings "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or . . . resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"[A] state court decision is contrary to our clearly established precedent if the state court applies a rule that *contradicts* the governing law set forth in [the Supreme Court's] cases or if the state court confronts a set of facts that are *materially indistinguishable* from a decision of [the Supreme] Court and nevertheless arrives at a result different from our precedent." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (emphases added) (internal quotation marks and citation omitted). Furthermore, "an unreasonable application of federal law is different from an incorrect application of federal law." *Williams v. Taylor*, 529 U.S. 362, 410 (2000). This means that "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the state court decision must be "objectively

unreasonable." *Id.* at 409. "This distinction creates 'a substantially higher threshold' for obtaining relief than *de novo* review." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).

Thus, AEDPA "imposes a highly deferential standard for evaluating state-court rulings" and "demands that [they] be given the benefit of the doubt." *Id.* (internal quotation marks and citation omitted).**[4]** "There must be

---

**[4]** Our court has struggled to correctly apply AEDPA's highly deferential standard. *See, e.g.*, *Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2558 (2018) (per curiam) ("[t]he Ninth Circuit failed to . . . apply" the proper standard and instead "spent most of its opinion conducting a *de novo* analysis"); *Kernan v. Cuero*, 138 S. Ct. 4, 9 (2017) (per curiam) (finding "several problems with the Ninth Circuit's reasoning," including that it failed to recognize that "fairminded jurists could disagree" about how to construe Supreme Court precedent (citation omitted)); *Davis v. Ayala*, 576 U.S. 257, 260 (2015) ("The Ninth Circuit's decision was based on the misapplication of basic rules regarding harmless error."); *Lopez v. Smith*, 574 U.S. 1, 6 (2014) (per curiam) (criticizing "the Ninth Circuit in particular" for applying a legal standard nowhere found in AEDPA); *Johnson v. Williams*, 568 U.S. 289, 297 (2013) (holding that "the Ninth Circuit declined to apply the deferential standard of review" mandated by AEDPA); *Cavazos v. Smith*, 565 U.S. 1, 7 (2011) (per curiam) ("When the deference to state court decisions required by § 2254(d) is applied to the state court's already deferential review, there can be no doubt of the Ninth Circuit's error below." (citation omitted)); *Felkner v. Jackson*, 562 U.S. 594, 598 (2011) (per curiam) ("[t]here was simply no basis for the Ninth Circuit" to grant habeas relief under AEDPA's highly deferential standard, "particularly in such a dismissive manner"); *Premo v. Moore*, 562 U.S. 115, 123 (2011) ("The [Ninth Circuit] was wrong to accord scant deference to counsel's judgment, and doubly wrong to conclude it would have been unreasonable to find that the defense attorney qualified as counsel for Sixth Amendment purposes."); *Harrington v. Richter*, 562 U.S. 86, 92 (2011) ("[J]udicial disregard [for the sound and established principles of when to issue a writ of habeas corpus] is inherent in the opinion of the Court of Appeals for the Ninth Circuit here under review.");

more than a 'reasonable possibility' that the error was harmful." *Davis v. Ayala*, 576 U.S. 257, 268 (2015) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). The *Brecht* standard for determining harmlessness reflects the view that a "[s]tate is not to be put to th[e] arduous task [of retrying a defendant] based on mere speculation that the defendant was prejudiced by trial error; the court must find that the defendant was actually prejudiced by the error." *Calderon v. Coleman*, 525 U.S. 141, 146 (1998) (per curiam); *see also Larson v. Palmateer*, 515 F.3d 1057, 1064 (9th Cir. 2008) ("Review for harmless error under *Brecht* is more forgiving to state court errors than the harmless error standard the Supreme Court applies on its direct review of state court convictions." (internal quotation marks and citation omitted)).

Here, the majority does not correctly apply this standard of review—or cite any of these principles—in reviewing the California Court of Appeal's harmlessness conclusion. First, the majority frames the question erroneously by suggesting that our reasonableness review is informed by *Chapman v. California*, 386 U.S. 18, 24 (1976), which requires finding a constitutional error to be "harmless beyond a reasonable

---

*Knowles v. Mirzayance*, 556 U.S. 111, 121 (2009) (holding the Ninth Circuit's erroneous issuance of a writ was "based, in large measure, on its application of an improper standard of review"); *Uttecht v. Brown*, 551 U.S. 1, 22 (2007) ("[t]he Court of Appeals neglected to accord" the proper deference to the state trial court); *Schriro*, 550 U.S. at 473 ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold."); *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam) (criticizing the Ninth Circuit for "substitut[ing] its own judgment for that of the state court, in contravention of 28 U.S.C. § 2254(d)"). Despite the Supreme Court's repeated admonitions, the majority repeats our court's sadly regular error.

doubt." Majority at 5, 26. But *Chapman* has no relevance to this Court's habeas review, either directly or through a back-door gloss on our review. In *Brecht*, the Supreme Court held the *Chapman* standard too "onerous" for "determining whether habeas relief must be granted." 507 U.S. at 623. "When a *Chapman* decision is reviewed under AEDPA, 'a federal court may not award habeas relief under § 2254 unless *the harmlessness determination itself was unreasonable*.'" *Ayala*, 576 U.S. at 269 (quoting *Fry v. Pliler*, 551 U.S. 112, 119 (2007)); *see also Rademaker v. Paramo*, 835 F.3d 1018, 1023 (9th Cir. 2016). AEDPA's language is clear. We review only whether the state court decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Moreover, the majority fails to cite a single Supreme Court case showing the California Court of Appeal's decision was "contrary to . . . clearly established Federal law." 28 U.S.C. § 2254(d). It does not establish that the Court of Appeal applied a rule contradicting the governing law, or that the Court of Appeal deviated from Supreme Court precedent with materially indistinguishable facts. *See Lockyer*, 538 U.S. at 73.

The majority also elided aspects of the trial that cured any prejudicial effect of the supposed error. This oversight is particularly egregious because it disregards almost the entire rationale provided by the California Court of Appeal. The Court of Appeal wrote four sentences explaining its rationale for finding any error harmless. Three of those sentences have to do with instructions given to the jury, which the majority ignores in its harmlessness analysis. The Court of Appeal noted:

> The court instructed the jury Ford was presumed innocent until the contrary was proven beyond a reasonable doubt (CALCRIM No. 220) and to disregard any conflicting statements made by the attorneys concerning the law (CALCRIM No. 200). Additionally, the prosecutor repeatedly reminded the jury of his burden to establish guilt beyond a reasonable doubt. The jury was properly informed about the prosecution's burden.

These conclusions are reasonable. "Jurors do not sit in solitary isolation booths parsing instructions"—or prosecutors' comments—"for subtle shades of meaning in the same way that lawyers might." *Boyde*, 494 U.S. at 380–81. And based on the instructions given—which the jury is presumed to have followed, *see Tak Sun Tan*, 413 F.3d at 1115—the jury understood everything it needed to render a constitutional verdict. The jury knew, based on the instructions, that it should not take whatever was said in closing arguments as the law. More importantly, it understood the concept that the presumption exists to drive home "that the State has the burden of establishing every element of the offense beyond a reasonable doubt." *Delo v. Lashley*, 507 U.S. 272, 278 (1993). Put differently, the jury was not misled into thinking that it could decide the case based on suspicion or extra-record evidence. It knew that the burden of proof was beyond a reasonable doubt. *See Taylor v. Kentucky*, 436 U.S. 478, 484–85 (1978) (explaining the dual purpose of the presumption of innocence); *see also Estelle v. Williams*, 425 U.S. 501, 503 (1976) (noting that the presumption of innocence embodies "the principle that guilt is to be established by probative evidence and beyond a

reasonable doubt"). The Court of Appeal's reliance on the jury instructions as support for its harmlessness conclusion was therefore reasonable.

The Supreme Court's decision in *Brown v. Payton*, 544 U.S. 133 (2005), reversing our court's decision, supports this conclusion. There, a prosecutor erroneously stated during closing argument that the jury was not allowed to consider mitigation evidence. *Id.* at 138. Defense counsel's objection was overruled without an instant curative instruction. *Id.* But "[t]he jury was not left without any judicial direction." *Id.* at 146. The jury was instructed before deliberations began that it could consider all evidence presented at trial unless told otherwise. *Id.* Because it was never instructed that it could not consider the mitigation evidence, it was not unreasonable for the Court of Appeal to conclude that any error caused by the prosecutor's misstatement of the law was harmless. *Id.* at 147.

The majority largely overlooks the effect of the jury instructions and instead focuses on the evidence of guilt. Here, too, it errs. According to the majority, this was "a very close case" based in large part on "circumstantial" and "incomplete" evidence, so any error must have been harmful. Majority at 26. But the majority's view of the closeness of the case is not determinative under AEDPA's analysis. There was nothing "objectively unreasonable" about the Court of Appeal's conclusion that "the evidence of Ford's guilt was strong." So under AEDPA, we must defer to that finding.

To be sure, the evidence of guilt may not have been "overwhelming." *Brecht*, 507 U.S. at 639. But it was "certainly weighty." *Id.* One need look no further than the main piece of direct evidence in this case: the partial palm

print. That print was found on the victim's car, just four hours after it was washed. As the prosecutor observed, the print was also a left palm print, in the exact location where a right-handed shooter would be expected to place his left hand when leaning into the window. And Ford had no explanation for why his left palm print might be on that exact location within proximate timing of the murder other than that he touched the car some other time. As Ford put it, "[T]hat don't mean nothing. That just means I came in contact with the vehicle at one time or another." This evidence, paired with the multiple pieces of circumstantial evidence suggesting Ford's guilt—including Ford's Facebook post; his phone call with his girlfriend; the multiple stolen cell phones; his height, general appearance, and general age consistent with witness descriptions; and the white vehicle he was driving—provide a reasonable basis for concluding that the evidence of guilt was strong enough that some passing statements during a closing argument did not create a "reasonable probability of a different result." *Hein v. Sullivan*, 601 F.3d 897, 906 (9th Cir. 2010) (internal quotation marks and citation omitted).

The majority's conclusion to the contrary relies in large part on the purported inconsistency between the jury's guilty conviction for murder and its divided vote on one of the firearm enhancements. But assessing the reason for any potential inconsistency is "pure speculation" because there is no way of knowing whether the inconsistency was "the product of lenity" for Ford. *See United States v. Powell*, 469 U.S. 57, 66 (1984). Nor is the result necessarily inconsistent, as the jury could have determined that Ford was involved in a felony in which Martinez was murdered, but did not actually pull the trigger. Regardless, even a potentially inconsistent jury verdict provides no support for any error

being harmful here. And it fails to justify disregarding the Court of Appeal's finding of harmlessness which is entitled to substantial deference under AEDPA.

The majority also focuses on the length of deliberations and the jury being "hopelessly deadlocked." Majority at 22–23, 26. But the majority's simplistic discussion of this issue grossly overstates the deadlock. The deadlock was caused by one juror. The other 11 were not deadlocked at all; they were ready to convict. One holdout juror—who eventually voted to convict—cannot bear the weight the majority gives it. And it certainly does not provide a basis for deeming the Court of Appeal's harmlessness conclusion "unreasonable."

\*   \*   \*

Under AEDPA, "[o]ur aim is not to punish society for the misdeeds of the prosecutor; rather, our goal is to ensure that the petitioner received a fair trial." *Trillo v. Biter*, 769 F.3d 995, 1001 (9th Cir. 2014). Ford received a fair trial, and we must defer to the Court of Appeal's eminently reasonable finding of harmlessness in any event. I would deny relief, and thus respectfully dissent.