**FOR PUBLICATION**

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

KEITH UNDRAY FORD,
*Petitioner-Appellant*,

v.

SUZANNE M. PEERY, Warden,
*Respondent-Appellee.*

No. 18-15498

D.C. No.
2:15-cv-02463-
MCE-GGH

ORDER AND
OPINION

Appeal from the United States District Court
for the Eastern District of California
Morrison C. England, Jr., District Judge, Presiding

Argued and Submitted January 22, 2020
San Francisco, California

Filed June 8, 2021

Before: William A. Fletcher and Ryan D. Nelson, Circuit
Judges, and Donald W. Molloy,[*] District Judge.

Order;
Opinion by Judge W. Fletcher;
Partial Concurrence and Partial Dissent by Judge R. Nelson

---

[*] The Honorable Donald W. Molloy, United States District Judge for
the District of Montana, sitting by designation.

## SUMMARY[**]

### Habeas Corpus

The panel filed (1) an order granting Warden Suzanne Peery's petition for panel rehearing and denying as moot Peery's petition for rehearing en banc, (2) a superseding opinion affirming the district court's denial of Keith Undray Ford's habeas corpus petition challenging his California conviction for first-degree murder, and (3) a partial dissent/concurrence.

In the superseding opinion, the panel granted Ford's motion to expand the Certificate of Appealability as to his claim that the prosecutor's statements during closing argument that the "presumption of innocence is over" and Ford "was not presumed innocent anymore" violated due process under *Darden v. Wainwright*, 477 U.S. 168 (1986). Because the California Court of Appeal assumed without deciding that the prosecutor misstated the law, there was no state-court decision to which the panel could defer on this point. The panel wrote that even if there were a state-court decision holding that prosecutor did not misstate the law, the panel would conclude that such a holding would have been unreasonable because the prosecutor misstated clear and long-standing federal law as articulated in a number of Supreme Court decisions.

As to prejudice, the panel observed that the Court of Appeal applied the functional equivalent of the *Darden*

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

harmlessness test in holding that the prosecutor's statement was harmless. The panel was required to give deference to that decision because a determination of prejudice constitutes an "adjudication on the merits" for AEDPA purposes. Even with AEDPA deference, the panel viewed this as a close case. The panel held, however, that because there was substantial evidence of guilt, a reasonable jurist could have concluded that there was no reasonable probability that, in the absence of the prosecutor's statements that the presumption of innocence was "over," the jury would have reached a different conclusion.

In a claim certified for appeal by the district court, Ford asserted that the jury found him guilty under an aiding-and-abetting theory that was neither charged nor argued to the jury, in violation of due process under *Dunn v. United States*, 442 U.S. 100 (1979). The panel wrote that the apparent inconsistency between the jury's guilty verdict on the murder charge and its inability to decide on three firearm enhancements is not a reason to set aside the guilty verdict. The panel concluded that the Court of Appeal did not err, much less unreasonably apply clearly established federal law, by denying Ford's claim under *Dunn*.

Judge R. Nelson dissented in part and concurred in the judgment. He would deny the Certificate of Appealability because Ford has not made a substantial showing that the prosecutor's statements, when viewed in context, caused the denial of a constitutional right. He wrote that the majority identifies no Supreme Court precedent clearly establishing that the prosecutor's statements in context were a constitutional violation.

## COUNSEL

Barry Morris (argued), Walnut Creek, California, for Petitioner-Appellant.

Kristin Liska (argued), Associate Deputy Solicitor General; Jill M. Thayer, Deputy Attorney General; Peggy S. Ruffra, Supervising Deputy Attorney General; Jeffrey M. Laurence, Senior Assistant Attorney General; Lance E. Winters, Chief Assistant Attorney General; Xavier Becerra, Attorney General; Attorney General's Office, San Francisco, California; for Respondent-Appellee.

## ORDER

Respondent-Appellee filed a petition for panel rehearing or rehearing en banc on December 11, 2020 (Dkt. Entry 74). We **GRANT** Respondent-Appellee's petition for panel rehearing. The opinion and dissent filed on September 28, 2020, and reported at *Ford v. Peery*, 976 F.3d 1031 (9th Cir. 2020), are withdrawn. Because we grant the petition for panel rehearing and withdraw our prior disposition, Respondent-Appellee's petition for rehearing en banc is moot. A superseding opinion and partial dissent/concurrence are filed concurrently with this order. Further petitions for rehearing or rehearing en banc may be filed.

**OPINION**

W. FLETCHER, Circuit Judge:

In August 2010, Ruben Martinez was shot and killed in Vallejo, California. Keith Ford was charged with first degree murder with three firearm enhancements. Ford was tried in the California Superior Court for Solano County in August 2012.

During closing argument, at the end of his rebuttal, the prosecutor told the jury that the presumption of innocence no longer applied. He said:

> *This idea of this presumption of innocence is over.* Mr. Ford had a fair trial. We were here for three weeks where . . . he gets to cross-examine witnesses; also an opportunity to present evidence information through his lawyer. He had a fair trial. This system is not perfect, but he had a fair opportunity and a fair trial. *He's not presumed innocent anymore.*

(Emphases added.) The defense attorney objected, "That misstates the law." The court overruled the objection. The prosecutor resumed, "*And so we're past that point.*" After four days of deliberations, the jury returned a verdict finding Ford guilty of first-degree murder.

After exhausting his state-court remedies, Ford sought federal habeas relief under 28 U.S.C. § 2254. The district court denied relief. On appeal to us, Ford claims: (1) that the prosecutor's statements during closing argument misled the

jury, in violation of due process under *Darden v. Wainwright*, 477 U.S. 168 (1986); and (2) that the jury convicted on a theory that was not presented, in violation of due process under *Dunn v. United States*, 442 U.S. 100 (1979).

We previously issued an opinion reversing the district court and directing that court to grant habeas corpus relief to Ford. *Ford v. Peery*, 976 F.3d 1032 (9th Cir. 2020). We now grant Peery's petition for panel rehearing. In this superseding opinion, we affirm the district court.

## I.  The Trial

### A.  Summary of Evidence Presented

On August 7, 2010, a Saturday evening, Ruben Martinez was killed in his SUV in front of his girlfriend's house on a short block of Beach Street between Benicia Road and Central Avenue in Vallejo, California. At about 10:00 p.m., Martinez had driven his girlfriend Jessica Blanco home so she could use the bathroom, check movie times, and get her jacket. Just before Martinez turned left onto Beach Street from Benicia Road, a white car ahead of them made a U-turn and went back past them the other way on Benicia Road. Blanco later testified at trial that she had not been able to see anyone in the car and that she could not identify the make or model of the car.

When they arrived at her house, Blanco went inside while Martinez stayed in his SUV with the motor still running. Martinez had washed the SUV earlier in the day. Blanco testified at trial that a few minutes after walking into the house, she heard a loud popping noise and the revving of an engine. She "heard a screeching noise, tires peeling, gravel."

Blanco went outside and saw that Martinez's SUV had crashed into a neighbor's garage down the street.

A few minutes before Martinez was shot, Bethel Johnson ("Johnson") and two of her children arrived at their house across the street from Blanco's house. When Johnson got out of her car, she saw Martinez sitting in his SUV with the motor running and headlights on, and with the driver's side window rolled up. Johnson testified that she could see through the tinted window that Martinez was looking at his lighted cell phone. She testified that there was a party on Beach Street at a black motorcycle club about half a block away on the other side of Benicia Road. There was a party at the club "almost every Saturday that month." Johnson testified that three young black men were walking up Beach Street toward the party. Two of them were "maybe 16, 17, 18 years old," and the other was "much older," "19, 21. Between there." Johnson testified that the older man was "somewhere" between 5'6" and 5'9", that he was wearing a dark hooded sweatshirt, and that he had dreads.

Johnson's daughter, Tenley Johnson ("Tenley"), got out of the back seat on the passenger side with the family Rottweiler on a leash. Johnson testified that the dog charged the man she had described as older. She called to Tenley, "Control your dog." Johnson testified that the man "said something like, 'Hi girly,' and then kind of like turned around away from the dog" and walked in the opposite direction toward Central Avenue, away from the party. She testified that she saw no weapons, and that the man said nothing threatening to Tenley. Between two and three minutes after getting into her house, Johnson heard what sounded like a shot and broken glass. Johnson went outside to check on her

car. She found her own car intact and saw no one on the street.

Tenley testified that she, too, had seen Martinez's cell phone light through the window of the SUV. She testified that when she got out of the car, she saw three young black men walking from Central Avenue toward the party on Benicia Road. She described them to a police officer that night as "teenagers." Tenley said her dog "started barking and . . . pulling me." The dog pulled her toward a man with "short hair." She said, "I couldn't really see the face. It was dark." She testified that the man was "skinny." Tenley is 5'3". She described the man as taller than she was and shorter than a 6'0" police officer who interviewed her. Tenley testified that the man was wearing a blue jacket with one or more white stripes "on the sleeves." She said it was "like a track jacket" and that it did not cover his head. One of the other men had dreads. She did not see any of the men's faces. When later shown six photographs, including a photograph of Ford, Tenley did not identify Ford as one of the three "teenagers" she had seen that night.

Another neighbor, Moises Cervantes, was walking out of his house on Beach Street. His house was between Blanco's house and Central Avenue. Cervantes heard a "pop" and saw Martinez's SUV coming toward him. After the SUV crashed, Cervantes looked up and down the street and saw no one.

Martinez was killed with a single shot. His foot was pressed on the gas pedal, causing the SUV to accelerate down the street until it crashed into the neighbor's garage. The engine continued to run, and the rear wheels to spin, even after the SUV came to a stop. Martinez's cell phone was found on the floorboard of the front passenger seat. The

driver's side window was intact and about "a quarter of the way down." The other windows on the driver's side were closed and intact. A photograph introduced into evidence shows two rear side windows on the passenger side that were shattered. At least one of the windows had been broken by first responders.

Five days later, on August 12, two Vallejo detectives lawfully stopped Keith Ford. Ford was twenty-three years old. He is black, is 5'8" tall, and weighs 165 pounds. At the time of the stop, he had short hair. He was driving a white Oldsmobile sedan. The detectives found Ford's cell phone inside his car and discovered six additional cell phones in the center console.

Ford was read his *Miranda* rights. One of the detectives, Les Bottomley, testified that Ford said that he had "bought [the cell phones] stolen off the street." Later in the same interview, however, Ford told Bottomley he did not know whether they had been stolen. Ford told Bottomley that he was right-handed. Bottomley asked Ford where he had been on the night of August 7. Ford answered that he "was at his mother's home and at that time would have been in bed." Bottomley testified that Ford's mother's house is about three and half miles from Blanco's neighborhood. Bottomley did not ask Ford about Martinez's murder.

When Ford was stopped, he had a jacket in his car. Detective Bottomley testified that he later showed the jacket to Tenley. Tenley told him that it was not the jacket she had seen on the young man with the short hair on August 7.

Ford was arrested on September 26 and charged with having a concealed firearm in his vehicle on that date. It was

stipulated to the jury that the firearm was unrelated to Martinez's murder. Ford was held on the charge in the Solano County Jail until December 14. On December 13, Detective Bottomley interviewed Ford again. He asked Ford if he knew Martinez. Bottomley testified that Ford said "he did not think he did." Ford repeated that he had been at his mother's house on the night of August 7 and had spent the night there. Bottomley told Ford that his palm print had been found on Martinez's SUV. Ford replied, "That don't mean nothing. That just mean I came in contact with the vehicle at one time or another."

While Ford was in jail on the firearm charge, he spoke to his girlfriend on the telephone. The call was recorded. Ford said:

> [L]uckily I ain't in here for murder, that's all I keep thinking about . . . oh well I wish it didn't have to happen . . . I just [wish] I was at home . . . I know I gotta deal with my (unintelligible) it's too late for all that . . . to be wishing I was at home . . . See I'm disappointed in myself. But [expletive] that's what happens when you carry a gun. Ain't nothin good gonna come of it. And I know this and [expletive] still happen, cause I tell other people the only thing you gonna get out of a gun is you gonna throw down with it or you gonna shoot somebody with it. And I tell everybody that and look at my [expletive].

A recording of the call was played for the jury.

Several months after the murder, the following message appeared on Ford's Facebook page, directed at someone who had accused Ford of shooting him:

> I heard through the grapevine you was looking for the guy. Let me know something. And since you think I popped you, check this out. First off, I don't [expletive] with the Vistas. Second off, I am too good of a shooter to hit a [expletive] that many times and not knock they [expletive] down. Last, when you getting shot, I was on Fifth buying some syrup off Jigs. Plus, I don't even [expletive] with [expletive], so ain't nobody talked to me since I got out of jail last. Real killers move in silence. And would I brag on a job I didn't even complete? [Expletive] knocking [expletive] down. I don't need credit for an attempt, so take that how you want to.

The message was read to the jury.

The prosecution presented testimony from four fingerprint analysts about a partial latent left palm print found on Martinez's SUV. Niki Zamora of the San Mateo County Forensics Laboratory testified that she examined the SUV on August 11. She discovered the latent print on the outside of the driver's door, just below the window. The exterior of the vehicle was "rather dirty," with dirt and a sticky white substance on the door where she found the print. Fire extinguishers had been used on the SUV after the crash. Zamora testified that she cleaned off only some of the "dirt and debris" before "dusting" and taking her "first lift" of the print. She did not indicate on the "fingerprint card" that the

area from which the print was lifted "had debris on it." Zamora was not "certified as a crime scene processor" because she "hadn't had enough experience yet."

Frankie Franck, a certified latent print examiner, matched Zamora's "first lift" to Ford's palm print. Franck compared the latent print to "several" electronically taken prints ("Live Scan prints") that he had been given, including one from Ford taken in October 2009 in Butte County, California. Franck testified that the latent print obtained by Zamora "was not of the best quality," and that it covered "probably 30 percent" of the total palm. Despite the quality of the latent print, and despite the fact that it was only a partial print, Franck testified that he was certain of the match—"[a]s certain as I am sitting here."

Zamora then confirmed Franck's match. She conceded that she had not followed the lab's normal protocol, which required that a confirming print analyst "not, in any way, [be] associated with the work that . . . had [been] done." Zamora was, of course, directly associated with that work, for she had lifted the latent print from the SUV. Zamora was not certified as a latent print examiner. She had taken the certification test and was awaiting the result.

Darrell Klasey, a certified latent print examiner at the Solano County Sheriff's Office, took a rolled ink print of Ford's hands in May 2011. Klasey compared the ink print of Ford's left palm to the Live Scan print that Franck had been given. Klasey concluded that the ink print and the Live Scan print were from the same person. Cross-examination revealed Klasey's questionable performance at a previous agency.

Lynne Lazzari, a latent fingerprint analyst at the Solano County Sheriff's Office, confirmed Klasey's conclusion. Her analysis was based only on the two prints that Klasey had given her (Ford's ink print and the Live Scan print analyzed by Franck), and she knew that Klasey had already concluded that they matched. Lazzari testified, "I did my own independent study and came up with why it was the same person." She testified that she "more or less" followed a standard method for comparing prints. When questioned about the standard method, which requires examining the unknown print before the known print, she responded that she compared the prints side by side: "Well, that's why I said 'more or less.' I do it my way." When asked whether her method had "ever been tested or validated for accuracy," she responded, "No." Lazzari had never taken the test to be certified as a latent print examiner.

There was also testimony about the condition of Martinez's SUV after it crashed into the garage. As noted above, Zamora had examined the SUV on August 11, 2010. She testified that the driver's side window was intact and was "partially down." Detective Bottomley, who had been at the crime scene on the night of the murder, had earlier testified that the driver's side window was intact and was "about a quarter of the way down." According to the prosecution's crime scene reconstructionist, the driver's side window was 1.2 feet open, and a 5'8" individual could stand by the SUV and reach through the window without contortion. The prosecutor asked whether there was a "[l]arge enough space to put a hand in." Bottomley had answered, "Absolutely." Zamora testified that the other driver's side windows were intact but that the "two rear passenger side windows" were "shattered," with "[n]o glass there." Photographs of the SUV, supporting Zamora's testimony, were shown to the jury.

Zamora testified that there were no bullet holes "either inside . . . or outside" the SUV.

Finally, Susan Hogan, M.D., a forensic pathologist, testified about the bullet wound and the manner of shooting. She testified that Martinez was killed by a single shot to the back left side of his head. The bullet entered about an inch and a half from the top of his head and two inches left from the posterior (back) midline. It traveled downward, forward, and to the right, coming to rest in the soft tissue of the right side of the neck. Dr. Hogan testified that death was "[v]irtually instantaneous." She testified that there was no soot or "stippling" at or near the entry point, which meant that the shot was fired from "at least three feet away."

Defense counsel presented evidence that other than a brief conversation on the night of the murder, law enforcement did not identify or contact anyone at the motorcycle party down the street. Law enforcement collected license plate numbers of all of the vehicles on the street, but did not follow up on any of them. Law enforcement never showed Blanco a picture of Ford's white Oldsmobile to determine whether it was the car she had seen on the night of the murder. No one reviewed the contents of the stolen cell phones recovered from Ford's car. Though one witness reported hearing multiple shots, the only bullet found was the one that killed Martinez. No gun or shell casings were ever found. There was gunshot residue on the inside of the driver's side door, but there was no residue on the window seal of the door or on Martinez's clothes. The only DNA found at the scene belonged to Martinez.

## B.  Attorneys' Arguments

In his closing argument, the prosecutor contended that Martinez's murder was "a robbery gone bad."  His theory was that Ford had put his left hand on the outside of the driver's side door, had reached through the partially opened driver's window with his right hand, and had shot Martinez in the head:

> There is compelling evidence in this case, . . . and that would be the defendant's palm print on the victim's car on his driver's door, right in the position where a person, a right-handed person with a firearm in their right hand, would have shot and killed the victim. . . .  No unusual contortion would have to take place for a person of 5'8" to stick their hand in there and fire.

The prosecutor further argued that Ford's recorded telephone conversation with his girlfriend and his Facebook post supported his contention that Ford shot Martinez.

The prosecutor did not try to reconcile his contention that Ford had reached through the driver's side window and shot Martinez as he sat in the driver's seat with Dr. Hogan's testimony, which required the gun to have been "at least" three feet away.  The prosecutor also did not try to reconcile his contention with Johnson's testimony that she had heard the sound of a shot and broken glass with the photograph of the SUV showing that two rear side passenger windows had been shattered.

In her responsive closing argument, Ford's attorney contended that the fingerprint identification was unreliable. She emphasized the poor quality of the latent palm print lifted from the SUV by Zamora and contended that the unqualified fingerprint analysts were not to be trusted. She contended that in his telephone conversation with his girlfriend, Ford was "talking about the fact that he's in custody for a gun and thank God, thank God he didn't kill anyone." She characterized Ford's Facebook post as "talking smack to someone behind a computer screen."

At the end of his rebuttal closing argument, the prosecutor told the jury:

> *This idea of this presumption of innocence is over.* Mr. Ford had a fair trial. We were here for three weeks where . . . he gets to cross-examine witnesses; also an opportunity to present information through his lawyer. He had a fair trial. This system is not perfect, but he had a fair opportunity and a fair trial. *He's not presumed innocent anymore.*

(Emphases added.) Ford's attorney objected, "That misstates the law." The court held a sidebar. The court then said in front of the jury, "All right. The objection is overruled." The prosecutor resumed, "*And so we're past that point.*" The jury began its deliberations shortly thereafter, on the same day.

## C.  Jury Deliberations

The jury was instructed on the elements of the charged crimes of murder and felony murder. The jury was further

instructed on charged enhancements based on the use of a firearm.

On the second day of deliberations, the jury sent out a written question: "If someone believes that the defendant was present at the time of the shooting and was an active participant in the attempted robbery, but was not the actual shooter, does that imply guilt of either the first or second-degree murder charge?" The court commented to the attorneys, "It's certainly an unusual question, given there was really no one [who] argued that there was someone else while the defendant was present." The prosecutor suggested the question might have reflected the fact that two other people had been described in the testimony, "although I didn't even make any arguments about them at all in my closing or that they had any involvement." With the agreement of both counsel, the court simply referred the jury to the instructions already given. The jury also requested a readback of Johnson's testimony. On the fourth day of deliberations, Friday, August 24, the jury reported that they were "hopelessly deadlocked," with one juror holding out for acquittal. After taking testimony from jury members individually, the court sent them back to deliberate further.

The following Tuesday, August 28, the jury returned a unanimous verdict that Ford was guilty of first-degree murder. The jury reported that they were "hopelessly deadlocked" on the three firearm enhancements. The court inquired and learned that the final vote on the first enhancement—"personal use of a firearm during the commission of the crime"—had been seven to five. The court declared a mistrial as to all three firearm enhancements.

## II. Post-Trial Procedural History

On direct appeal, the California Court of Appeal affirmed Ford's conviction.

On the presumption-of-innocence issue, the Court of Appeal identified a conflict among the Courts of Appeal. Several Courts of Appeal had held that there was no prosecutorial misconduct when the prosecutor told the jury that the presumption of innocence no longer applied once sufficient evidence of guilt had been presented. For example, in *People v. Goldberg*, 161 Cal. App. 3d 170, 189 (1984), the court affirmed the conviction and found no prosecutorial misconduct in a case in which the prosecutor had said in closing argument, "[O]nce you've heard this case, once the case has been proven to you—*and that's the stage we're at now*—the case has been proved to you beyond any reasonable doubt. I mean, it's overwhelming. *There is no more presumption of innocence.*" (First emphasis added.) But a different Court of Appeal later reached a contrary conclusion. In *People v. Dowdell*, 227 Cal. App. 4th 1388, 1407 (2014), the prosecutor twice told the jury during closing argument, in light of the strength of the State's evidence, that "[t]he presumption of innocence is over." The court in *Dowdell* distinguished *Goldberg* and ruled that defense counsel should have objected because the prosecutor misstated the law, but it held, on the record before it, that the error was harmless.

The Court of Appeal declined to reach the question whether the prosecutor had misstated the law in Ford's case. Assuming without deciding that the prosecutor had done so, the court held that any error was harmless: "We need not resolve any conflict between *Goldberg* [and other cases] on the one hand, and *Dowdell* on the other because we conclude

any assumed error is harmless under either the state ([*People v.*] *Watson*, [(1956)] 46 Cal.2d 818[, 836]) or federal constitutional standard (*see Chapman v. California* (1967) 386 U.S. 18, 24)."

On the jury-instruction issue, the Court of Appeal held that the jury's verdict did not show that it relied on a legal theory that had not been presented.  It recognized the apparent conflict between the jury's verdict that Ford was guilty of first-degree murder and its inability to decide whether he had used a firearm.  But it concluded that "disposition of one count [has] no bearing upon the verdict with respect to other counts, regardless of what the evidence may have been.  Each count must stand on its own merit."

The California Supreme Court denied Ford's petition for review in a one-line order.  Ford then sought state habeas in California Superior Court.  The Superior Court did not reach the merits of the claims at issue here because they had been raised and rejected on direct appeal.

Ford sought federal habeas relief under 28 U.S.C. § 2254. He raised several claims, all of which were rejected by the district court.  He appeals the denial of two claims:  (1) That the prosecutor's statements during closing argument that the "presumption of innocence is over" and Ford was "not presumed innocent anymore" violated due process under *Darden*[1]; and (2) That the jury found Ford guilty under a theory not presented, in violation of due process under *Dunn.* We discuss the claims in turn.

---

[1] This claim was uncertified on appeal.  We now **GRANT** Ford's motion to expand the Certificate of Appealability as to that claim.

### III.  Standard of Review

We review *de novo* a district court's denial of a petition for a writ of habeas corpus.  *Moses v. Payne*, 555 F.3d 742, 750 (9th Cir. 2009).  In order to obtain federal habeas relief from a state court conviction, a petitioner must show that the state court proceedings "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or . . . resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 402–03 (2000).  We defer to the last reasoned decision of the state court.  *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991); *Mann v. Ryan*, 828 F.3d 1143, 1151 (9th Cir. 2016).  Here, that is the decision of the California Court of Appeal on direct appeal.

### IV.  Discussion

#### A.  Due Process Violation under *Darden*

The first question is whether the prosecutor's repeated statement during closing argument that the presumption of innocence was "over" was misconduct in violation of due process under *Darden*.  Prosecutorial misconduct includes misstatements of law.  *See Deck v. Jenkins*, 814 F.3d 954, 985 (9th Cir. 2016) (finding *Darden* error where "the prosecutor gave incorrect direction to the jury about an element of California law under which Deck was convicted").  Improper prosecutorial statements violate due process if they "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process."  *Darden*, 477 U.S. at 181

(citation omitted).   Prosecutorial misconduct within the meaning of *Darden* does not require improper motive on the part of the prosecutor; it requires only an improper statement. But such misconduct "rises to the level of *Darden* error only if there is a reasonable probability that it rendered the trial fundamentally unfair." *Deck*, 814 F.3d at 985.

### 1.  Misstatement of the Law

Because the California Court of Appeal assumed without deciding that the prosecutor misstated the law, there is no state-court decision to which we can defer on this point. However, even if there were a state-court decision holding that the prosecutor did not misstate the law, we would conclude that such a holding would have been unreasonable. In stating that the presumption of innocence was "over," the prosecutor misstated clear and long-standing federal law as articulated in a number of Supreme Court decisions.  A jury must evaluate the evidence based on the presumption that the defendant is innocent.   If the jury concludes beyond a reasonable doubt that the defendant is guilty, then—and only then—does the presumption disappear.

The presumption of innocence is "the undoubted law, axiomatic and elementary." *Coffin v. United States*, 156 U.S. 432, 453 (1895).  The presumption of innocence is "vital and fundamental." *Id.* at 460.  It is "a basic component of a fair trial under our system of criminal justice." *Estelle v. Williams*, 425 U.S. 501, 503 (1976).  "[I]ts enforcement lies at the foundation of the administration of our criminal law." *Coffin*, 156 U.S. at 453; *see also Reed v. Ross*, 468 U.S. 1, 4–5 (1984).

Criminal defendants lose the presumption of innocence only once they have been convicted. *See*, *e.g.*, *Herrera v. Collins*, 506 U.S. 390, 399 (1993) ("Once a defendant has been afforded a fair trial *and convicted* of the offense for which he was charged, the presumption of innocence disappears.") (emphasis added); *Delo v. Lashley*, 507 U.S. 272, 278 (1993) ("Once the defendant has been *convicted* fairly in the guilt phase of [a capital] trial, the presumption of innocence disappears.") (emphasis added); *Betterman v. Montana*, 136 S. Ct. 1609, 1618 (2016) (a conviction "terminates the presumption of innocence").

### 2.  Prejudice

A violation of due process under *Darden* requires more than a prosecutorial misstatement.  There must be "a reasonable probability" that the misstatement "rendered the trial fundamentally unfair." *Deck*, 814 F.3d at 985.  "In essence, what *Darden* requires reviewing courts to consider appears to be equivalent to evaluating whether there was a 'reasonable probability' of a different result." *Hein v. Sullivan*, 601 F.3d 897, 914–15 (9th Cir. 2010); *see also Deck*, 814 F.3d at 979.

On the assumption that the prosecutor misstated the law, the Court of Appeal held that the prosecutor's misstatement was harmless under either of two standards. It wrote: "[A]ny assumed error is harmless under either the state ([*People v.*] *Watson*, [(1956)] 46 Cal.2d 818[, 836]) or federal constitutional standard (*see Chapman v. California* (1967) 386 U.S. 18, 24)."  The *Chapman* standard for determining harmlessness is different from the *Darden* standard, so we put it to one side.  But the *Watson* standard is indistinguishable from the *Darden* "reasonable probability" standard.  The

California Supreme Court wrote in *Watson*: "[A] miscarriage of justice should be declared only when the court, after an examination of the entire cause, including the evidence, is of the opinion that it is *reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error*." *People v. Watson*, 46 Cal. 2d 818, 836 (1956) (quotation marks omitted) (emphasis added). We recognize, of course, that in applying *Watson* the Court of Appeal was applying a state-law rather than a federal-law standard of harmlessness, but the *Watson* test is *in haec verba* the same as the *Darden* test. We therefore conclude that the Court of Appeal applied the functional equivalent of the *Darden* harmlessness test in holding that the prosecutor's statement was harmless.

If we were to decide harmlessness *de novo* under *Darden*, we would conclude that there was a reasonable probability of a different outcome absent the prosecutor's misstatement of the law. The evidence against Ford was circumstantial, incomplete, and to some degree in conflict. The jury took four days to reach a verdict and did so only after having reported to the judge that it was "hopelessly deadlocked." Finally, the jury's verdict was logically inconsistent—an almost sure sign of a compromise verdict—finding Ford guilty of murder but failing to find that he used a firearm in the commission of the murder. A determination of prejudice constitutes an "adjudication on the merits" for purposes of AEDPA deference. *See Davis v. Ayala*, 576 U.S. 257, 269 (2015) (holding that the state court's determination of harmlessness "undoubtedly constitutes an adjudication of [petitioner's] constitutional claim 'on the merits'"). We are therefore required to give deference to the decision of the Court of Appeal that the prosecutor's misstatements were harmless under the *Darden* standard. Even with AEDPA

deference, we view this as a close case. But we hold that a reasonable jurist could have concluded that there was no reasonable probability that, in the absence of the prosecutor's statements that the presumption of innocence was "over," the jury would have reached a different conclusion, for there was substantial evidence of guilt: Ford's unexplained left palm print just below the window on the outside of the driver's side door; a man matching Ford's (albeit general) description on the street next to Martinez's SUV just before the shooting; the stolen cell phones in Ford's car; Ford's recorded telephone conversation to his girlfriend while he was in jail ("[L]uckily I ain't in here for murder, that's all I keep thinking about . . . oh well I wish it didn't have to happen"); and Ford's Facebook post bragging about his shooting prowess.

## B. Due Process Violation under *Dunn*

"To uphold a conviction on a charge that was neither alleged in an indictment nor presented to a jury at trial offends the most basic notions of due process." *Dunn*, 442 U.S. at 106. Ford contends that he was found guilty on a charge of aiding and abetting even though no such charge was made in the indictment, and no such argument was made to the jury. In support of his contention, Ford points to the apparent inconsistency in the jury's decision: On the one hand, the jury convicted Ford of first degree murder in the shooting of Martinez. On the other hand, the jury hung on the three firearm enhancements, unable to decide whether Ford had used a firearm in committing the murder.

We are willing to assume that on the evidence presented Ford could have been convicted of an aiding and abetting crime. But that is not enough to show a violation of due process, for Ford could equally have been (and was)

convicted of first-degree murder. The apparent inconsistency between the jury's guilty verdict on the murder charge and its inability to decide on the firearm enhancements is not a reason to set aside its guilty verdict. There is no "rule that would allow criminal defendants to challenge inconsistent verdicts on the ground that in their case the verdict was not the product of lenity, but of some error that worked against them." *United States v. Powell*, 469 U.S. 57, 66, 67 (1984) (noting also that "a criminal defendant already is afforded protection against jury irrationality or error by the independent review of the sufficiency of the evidence undertaken by the trial and appellate courts."); *see also Harris v. Rivera*, 454 U.S. 339, 345 (1981) ("Inconsistency in a [jury's] verdict is not a sufficient reason for setting it aside."). Under *Powell*, the Court of Appeal did not err, much less unreasonably apply clearly established federal law, by denying his claim under *Dunn*.

## Conclusion

We conclude that the prosecutor's repeated statements to the jury during final argument that the presumption of innocence no longer applied were misstatements of clearly established law as articulated by the Supreme Court. We defer, however, to the state court's finding, applying the *Darden* standard, that there was not a reasonable probability of a different outcome had the prosecutor not misstated the law. We also conclude that the state court did not err under *Dunn* in upholding the jury's arguably inconsistent verdict. We therefore affirm the district court's denial of relief.

**AFFIRMED.**

R. NELSON, Circuit Judge, dissenting in part and concurring in the judgment:

Today is a somber day of justice for Ruben Martinez, an innocent young man with a full life ahead of him who was ruthlessly murdered. Petitioner Keith Ford was convicted of first degree felony murder of Martinez by a jury of his peers. The majority first held that Ford's petition for habeas relief should be granted. On rehearing, the majority reverses course. As a result, Ford remains legally accountable for Martinez's murder.

It is unusual, but not unheard of, for a panel majority to concede error on rehearing. *See Mendez v. Mukasey*, 525 F.3d 216 (2d Cir. 2008) (Sotomayor, J.), *on reh'g sub nom. Mendez v. Holder*, 566 F.3d 316 (2d Cir. 2009) (per curiam). For a panel majority to publicly recognize and correct its error requires a healthy dose of judicial humility. Ultimately, the art of good judging is tethering so closely to the rule of law and the Constitution that personal beliefs do not dictate the outcome of any issue or case. That ideal of judging, simple in theory, can test even veteran judges. But this ideal reflects the noblest role of an Article III judge. And, by reversing itself, the majority may avoid yet another reversal in our misapplication of deference under the Antiterrorism and Effective Death Penalty Act ("AEDPA"). *See Shinn v. Kayer*, 141 S. Ct. 517, 522 (2020) (per curiam) (noting the Supreme Court "has reversed the Ninth Circuit's application of AEDPA" in 14 cases in 18 years). I thus concur in the majority's judgment to deny Ford's habeas petition.

But the majority, even in its reversal on rehearing, is only half noble. I continue to dissent because I would deny the Certificate of Appealability ("COA"). Ford has not made a

"substantial showing" that the prosecutor's statements, when viewed in context, caused "the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The majority identifies no Supreme Court precedent "clearly establish[ing]" that the prosecutor's statements in context were a constitutional violation.  28 U.S.C. § 2254(d)(1).

No prosecutor should ever state or imply that the presumption of innocence is over before the jury returns a guilty verdict.  The majority correctly notes the "vital and fundamental" role the presumption of innocence plays in our criminal justice system.  *See* Majority at 21 (quoting *Coffin v. United States*, 156 U.S. 432, 460 (1895)).  But due process violations under *Darden v. Wainwright* require more than such generalities.  477 U.S. 168, 181 (1986).  And the majority still errs on rehearing in failing to grapple with the context of the prosecutor's statements and in finding legal error sufficient to support a due process violation.  We should not have granted the COA merely to affirm the state court's harmlessness finding.

Moreover, the majority remains equivocal on the harmlessness of the prosecutor's statements, which is surprising, given the strong evidence tying Ford to the murder and the context surrounding the prosecutor's statements.  Under appropriate AEDPA deference—but even under the majority's make-believe, hypothetical de novo review—the state court's harmlessness finding warrants denial of habeas relief.

I

Martinez was shot at point blank range in his car in front of his girlfriend's house before their date.  After a three-week trial, Ford was convicted of first degree felony murder.

During trial, the jury heard that Martinez had washed his car just hours before his date and his car was "clean and shiny." *People v. Ford*, No. A137496, 2014 WL 4446166, at *1 (Cal. Ct. App. Sep. 10, 2014).  A fingerprint examiner testified that after the murder, "a latent palm print on the driver's side of the door of Martinez's SUV, just beneath the window[,] . . . matched Ford's left palm print." *Id.* at *2. The examiner "was certain 'both impressions were made by the same palm.'" *Id.*  The jury heard Ford's explanation to police that his palm print meant that "I came into contact with the vehicle at one time or another." *Id.*  The prosecutor's theory was that Ford's left palm print on Martinez's car, in the exact location consistent with a right-handed man leaning into the driver window, particularly where the car had just been washed, placed Ford at the murder scene.

The jury also heard that a white car was seen driving in the same direction as Martinez and "made an abrupt U-turn directly in front of Martinez's car" moments before Martinez stopped at his girlfriend's house and just before Martinez was murdered. *Id.* at *1.  Ford drove a white car.

The jury also heard that three young African American men were walking toward Martinez as he waited in his car. One had short hair cut close to his scalp.  Ford is African American and at the time was 23 years old, had short hair, and was the approximate height described.

The jury also heard that as Martinez waited, he was on his cell phone, visible through his car window.  A few days after the murder, Ford was stopped by a detective and six stolen cell phones were found in the center console of Ford's car.  Ford told the detective that on the night Martinez was murdered, Ford was at his mother's house in Vallejo, about three miles from where Martinez was shot.

The jury also heard that four months after Martinez was murdered, Ford was in jail for an unrelated firearm possession charge.  Ford called his girlfriend from jail and said, "'luckily I aint in here for murder'" and noted that he knew he should not carry guns because "'the only thing you gonna get out of a gun is you gonna throw down with it or you gonna shoot somebody with it.'"  *Id.* at *2.  Several months after Martinez's murder, Ford posted comments on Facebook about being suspected of a murder and described in detail how he would conduct a murder.

Before closing arguments, the state trial court orally instructed the jury about the presumption of innocence and the government's burden to prove its case beyond a reasonable doubt.  The jury was instructed to form no opinion about the case until after jury deliberations begin.  And the jury was instructed to follow the law as detailed in the written jury instructions and to disregard any of counsels' comments that may conflict with the jury instructions.

In closing, the prosecutor repeatedly reminded the jury that the government bore the burden to prove its case beyond a reasonable doubt.  The prosecutor then walked through the evidence detailed above.  In rebuttal, the prosecutor stated, "This idea of this presumption of innocence is over. . . .  He's not presumed innocent anymore."  *Id.* at *6.  This drew an

objection from defense counsel, overruled by the trial court because the jurors have "been reminded continuously that they're not to form or express any opinions until after they deliberate with their fellow jurors, so I don't think there's any particular harm in that . . . ." The prosecutor then stated, "And so we're past that point." *Id.*

After closing, the district court provided the jury written instructions, including properly detailing the presumption of innocence, which were taken back into the jury room for deliberations. Defense counsel made no request for any additional jury instruction on the presumption of innocence.

The jury heard evidence more than enough to support, beyond a reasonable doubt, Ford's first degree felony murder conviction. The California Court of Appeal affirmed Ford's conviction on direct appeal, finding that any alleged prosecutor misconduct was harmless. The California Supreme Court denied review. The federal magistrate recommended denial of Ford's habeas petition and the district court adopted the magistrate's recommendation in full. While the district court certified three questions for appeal, it did not certify the question on potential prosecutorial misconduct.

## II

The majority holds that the prosecutor's comments about the presumption of innocence misstate the law on de novo review—because the issue was not addressed by the Court of

Appeal.[1]   Majority at 21.   But the prosecutor's isolated comments, taken in full context of the closing statements and jury instructions, were not misconduct that "so infected the trial with unfairness as to make [Ford's] conviction a denial of due process" under *Darden*, 477 U.S. at 181 (citation omitted).  By cherry-picking and examining the prosecutor's comments in isolation, the majority disregards the Supreme Court's admonition that "the arguments of counsel . . . must be judged in the context in which they are made." *Boyde v. California*, 494 U.S. 370, 385 (1990).   The majority misconstrues the prosecutor's comments rather than interpreting them in context of his full closing and rebuttal arguments.  In context, the comments do not rise to the level of prosecutorial misconduct.

"[A] court should not lightly infer that a prosecutor intend[ed] an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." *Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974).  The majority reaches its conclusion only by skewing the evidence and inferences in the light most favorable to Ford.  It thus infers that the jury drew the most damaging interpretation of the challenged comments, rather than the more likely, less damaging interpretation.   In context, the prosecutor argued in closing that the government

---

[1] In dictum, the majority posits that "even if there were a state-court decision holding that the prosecutor did not misstate the law, we would conclude that such a holding would have been unreasonable."  Majority at 21.  This hypothetical conclusion is dictum, not "germane to the eventual resolution of the case," *United States v. Johnson*, 256 F.3d 895, 914 (9th Cir. 2001) (en banc) (Kozinski, J., concurring), not "well-reasoned," *Enying Li v. Holder*, 738 F.3d 1160, 1164 n.2 (9th Cir. 2013), and therefore not binding on any future panel.

had met its burden of proving its case beyond a reasonable doubt, thereby overcoming the presumption of innocence. His challenged comments were not (as the majority concludes) inviting the jurors to disregard the presumption of innocence when they retired to the deliberation room.

The prosecutor made numerous statements supporting the more reasonable interpretation (still largely ignored by the majority on rehearing). For instance, the prosecutor introduced his closing, noting, "I'm going to go back over the facts of this case and show you why I have proven beyond a reasonable doubt that the defendant committed murder in this case . . . ." He hewed closely to this theme, repeating, "I want to tell you why it is that I have proven to you beyond a reasonable doubt that the defendant in this case committed an act that caused the death of Ruben Martinez . . . ." The prosecutor returned to this refrain repeatedly throughout his closing, stating the following:

- "Let me tell you . . . why it is that I have proven to you beyond a reasonable doubt that the defendant is guilty";

- "My burden of proof in the case to prove the charge that Mr. Ford is charged with is proof beyond a reasonable doubt";

- "In combination with the other information, that's proof beyond a reasonable doubt. . . . I have never shied away from what my standard of proof is in this case, but it's not an impossible standard. It's proof beyond a reasonable doubt";

- "[W]hen you . . . follow all the evidence and you follow all the law, you're going to reach the same conclusion that I asked you to reach at the beginning of this case that the defendant is guilty of murder"; and

- "[Y]ou did all make that promise at the beginning and I will hold you to that promise, if I prove my case beyond a reasonable doubt, that you would not hesitate for a second to convict the defendant."

On rebuttal, the prosecutor reiterated that defense counsel "doesn't have to present any evidence. It is my burden of proof." He also called the jurors' attention to the written instructions they would take with them into the deliberation room, inviting them to "just read the [reasonable doubt] instruction itself and . . . look at the instruction and what it says in particular."

Finally, just before making the challenged statements, the prosecutor walked through the evidence and reiterated, "I've provided you with all the information that you need to feel the abiding conviction in the truth of these charges." Each of his points (including the challenged statements) combined to form an unremarkable overarching argument: the evidence of defendant's guilt was so strong that the prosecutor had successfully proved his case beyond a reasonable doubt and thus overcame the presumption of innocence.[2] The majority

---

[2] By repeatedly emphasizing the government's burden of proving guilt "beyond a reasonable doubt," the prosecutor simultaneously emphasized it was his burden to overcome the presumption of innocence to which Ford was entitled. This is because the government's burden to prove a defendant's guilt beyond a reasonable doubt is closely linked with

shows no reasonable likelihood that these statements, taken together, misled the jurors or caused them to believe the presumption of innocence terminated before they had reached a verdict of guilty beyond a reasonable doubt.

Contrast this with the facts in *Kentucky v. Whorton*, 441 U.S. 786 (1979), where the Supreme Court held the Due Process Clause does not require a jury instruction on the presumption of innocence at all. *Id.* at 789–90. In *Whorton*, the jury was instructed that they "could return a verdict of guilty only if they found beyond a reasonable doubt" that the defendant was guilty of the acts charged. *Id.* at 787. This instruction alone—even without the presumption of innocence instruction—was deemed constitutionally sufficient. *See id.* at 789–90. Here, the trial court exceeded the standard in *Whorton*. Not only did the prosecutor repeatedly emphasize that his burden was to prove Ford's guilt beyond a reasonable doubt, *see supra* at 32–33, the jury was formally instructed that Ford was entitled to a presumption of innocence and that this presumption required proof of guilt beyond a reasonable doubt. Thus, as in *Whorton*, weighing the prosecutor's challenged statements against "all the instructions [provided] to the jury" and "the arguments of counsel," Ford was not "deprived . . . of due process of law in light of the totality of the circumstances." 441 U.S. at 789–90.

The surrounding context of the prosecutor's statements also explains the trial court's decision to overrule defense counsel's objection to the contested statements. The court undoubtedly knew the presumption of innocence continued

---

the presumption of innocence. *See Cool v. United States*, 409 U.S. 100, 104 (1972); *Schultz v. Tilton*, 659 F.3d 941, 943 (9th Cir. 2011).

until jury deliberations, understood what the prosecutor meant, and reasonably determined the comments in context presented no risk of juror confusion.  The court stated (outside the jury's presence), in response to counsel's objection: "[The jurors have] been reminded continuously that they're not to form or express any opinions until after they deliberate with their fellow jurors, so I don't think there's any particular harm in that . . . ."  The court was also aware the jurors had been explicitly instructed orally on the presumption of innocence and the written instructions would be taken with them into jury deliberations.

In short, no reasonable juror would interpret the prosecutor's statements, in context, consistent with the majority's isolated gloss.  Despite indications the jurors were confused on other issues, there is no suggestion any juror was confused on the presumption of innocence.  Indeed, the jury acquitted Ford on separate firearm enhancement allegations, which undermines the majority's conclusion that the jurors believed the presumption of innocence was over during the prosecutor's closing.

### III

The majority also needlessly opines that if it were "decid[ing] harmlessness *de novo* under *Darden*, [it] would conclude that there was a reasonable probability of a different outcome absent the prosecutor's misstatement of the law." Majority at 23.  Even assuming the prosecutor's statements viewed in context rose to the level of a misstatement of clearly established Supreme Court precedent, the statements are harmless under any standard.  More fundamentally, the majority has no basis to analyze a hypothetical de novo review which is contrary to the law.  Like the majority's

separate dictum, *see supra* at 31 n.1, this dictum is not germane, not well-reasoned, and thus not binding on any future panel. In reversing course on harmlessness, the majority ultimately backs into the correct result. But the majority's analysis remains riddled with unnecessary errors.

"[E]ven if the [prosecutor's] comment[s are] understood as directing the jury's attention to inappropriate considerations," that does not by itself establish a due process violation under *Darden* absent something more to show that the comments prejudiced the defendant. *Parker v. Matthews*, 567 U.S. 37, 47 (2012) (per curiam). Courts must consider "whether the jury was instructed to decide solely on the basis of the evidence rather than counsel's arguments, and whether the state's case was strong." *Furman v. Wood*, 190 F.3d 1002, 1006 (9th Cir. 1999); *see also Allen v. Woodford*, 395 F.3d 979, 998 (9th Cir. 2005). Here, the state trial court did not violate due process under *Darden* because the court's instructions eliminated any "reasonable probability that [the prosecutor's statements] rendered the trial fundamentally unfair." *See Deck v. Jenkins*, 814 F.3d 954, 985 (9th Cir. 2016).

Before closing arguments, the trial court orally instructed the jury that the defendant was presumed innocent and the prosecution had to prove each element of the charged offenses beyond a reasonable doubt. The court instructed, "You may not convict the defendant unless the People have proved his guilt beyond a reasonable doubt." The court also instructed the jury to apply the law as explained by the court's instructions and disregard any comments or arguments by counsel that conflicted with the court's instructions. Further, the court admonished the jurors that "[n]othing that the attorneys say is evidence. In their . . .

closing arguments, the attorneys discuss the case, but their remarks are not evidence." The written jury instructions were taken into the deliberation room.

Ultimately, by dismissing these instructions—both oral and written—as inadequate, the majority disregards that "we presume jurors follow the court's instructions absent extraordinary situations." *See Tak Sun Tan v. Runnels*, 413 F.3d 1101, 1115 (9th Cir. 2005); *see also Allen*, 395 F.3d at 998 (explaining that although prosecutor's statement was misconduct, "given the trial court's instruction that statements by counsel were not evidence, and given the weight of the evidence against him, the prosecutor's comments did not deprive Allen of a fair trial"); *United States v. Necoechea*, 986 F.2d 1273, 1280 (9th Cir. 1993) (holding the prosecutor's improper remarks in closing did not constitute a miscarriage of justice when the court gave a general instruction that attorneys' arguments were not evidence in the case). "[P]rosecutorial misrepresentations . . . are not to be judged as having the same force as an instruction from the court." *Boyde*, 494 U.S. at 384–85.

In concluding the prosecutor's statements were not harmless under a de novo standard of review, the majority relies in large part on the purported inconsistency between the jury's guilty conviction for murder and its divided vote on one of the firearm enhancements. *See* Majority at 23. But assessing the reason for any potential inconsistency is "pure speculation" because there is no way of knowing whether the inconsistency was "the product of lenity" for Ford. *See United States v. Powell*, 469 U.S. 57, 66 (1984). Nor is the result necessarily inconsistent, as the jury could have determined that Ford was involved in a predicate felony in which Martinez was murdered (as the state charged), but that

Ford may not have pulled the trigger. *Ford v. Peery*, No. 2:15-cv-2463-MCE-GGH, 2017 WL 527898, at *7 (E.D. Cal. Feb. 9, 2017), *adopted by* 2017 WL 11490100 (E.D. Cal. Apr. 20, 2017). Regardless, a potentially inconsistent verdict provides no support for any error being harmful here, even under the majority's hypothetical de novo review.

The majority also focuses on the length of deliberations and the jury being "hopelessly deadlocked." Majority at 23. But the majority's simplistic discussion of this issue grossly overstates the deadlock. The deadlock was caused by one juror. The other 11 were not deadlocked at all; they were ready to convict. One holdout juror—who eventually voted to convict—cannot bear the weight the majority would otherwise give it.

There is no reasonable likelihood the jury misunderstood the prosecutor's comments and convicted Ford without finding guilt beyond a reasonable doubt. Therefore, even if the de novo standard hypothetically applied (and no judge contends it does), the prosecutor's comments would still be harmless. I disagree that this was "a close case" under AEDPA deference. Majority at 24.

\* \* \*

On rehearing, I concur in the judgment to affirm the district court's denial of habeas relief. Likewise, I agree that there was no separate due process violation under *Dunn v. United States*, 442 U.S. 100 (1979). However, I disagree with the decision to grant the COA and much of the majority's convoluted reasoning.